**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, et al., Petitioners,**

v.

**CBI INDUSTRIES, INC., Respondents.**

**No. D–4353.**

Supreme Court of Texas.

Argued Sept. 20, 1994.

Decided Oct. 5, 1995.

David W. Prasifka, Diane M. Guariglia, Barbara Lynn Hawley, Daniel F. Shank, Daniel J. Petroski, Houston, M. Elizabeth Medaglia, Washington, DC, Robert N. Kelly, Houston, Richard S. Kuhl, Washington, DC, Gorge B. Hall, New Orleans, LA, Kent E. Westmoreland, James P. Wallace, Houston, for petitioners.

Jordan Stanzler, Palo Alto, CA, Robert Alan Johnson, New York City, Robert M. Roach, Jr., Houston, Eugene R. Anderson, New York City, Ronald E. Cook, Stephen R. Sulentic, Houston, for respondents.

PER CURIAM.

The Motion For Rehearing is overruled. Our opinion of March 2, 1995, is withdrawn and the following opinion is substituted.

In this action for damages, injunctive relief, and a declaration of coverage, the issue is whether so-called "absolute pollution exclusions" in insurance policies unambiguously apply to exclude damage coverage from an accidental explosion producing a toxic hydrofluoric acid cloud over a city. The trial court granted summary judgment in favor of the defendant insurance companies. The court

of appeals reversed the summary judgment and remanded the cause to the trial court. 860 S.W.2d 662. We agree with the trial court that the provisions unambiguously apply under the circumstances presented. We reverse the judgment of the court of appeals and affirm the trial court's judgment.

CBI Industries, Inc. ("CBI") brought this action against various insurance companies which insured CBI under general liability policies. The insurers fall into three groups providing successive "layers" of coverage: (1) National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"); (2) Anglo American Insurance Company, Ltd. and others (collectively "Anglo American"); and (3) Rome and Companies (collectively "Rome"). Each of the policies issued to CBI by these companies contained a version of what is known in the industry as an "absolute pollution exclusion." The National Union policy contained the following exclusion:

> This policy does not apply to ... any Personal Injury or Property Damage arising out of the actual or threatened discharge, dispersal, release or escape of pollutants, anywhere in the world; ... "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste materials include materials which are intended to be or have been recycled, reconditioned or reclaimed.

The Anglo American and Rome policies contained this exclusion:

> Notwithstanding anything to the contrary contained in this policy, this policy is amended in that it shall not apply to any claim or claims: For personal injuries or property damages directly or indirectly caused by seepage or pollution or contamination of air, land, water or any other property, however caused and whenever occurring.

In October of 1987, CBI, through its wholly owned subsidiary CBI Na–Con, Inc.[1], was working as a contractor for Marathon Petroleum Company ("Marathon") in connection with a periodic "turnaround" of Marathon's Texas City Refinery, during which the refinery is shut down and equipment removed for cleaning, maintenance and replacement. As contractor, CBI was supervising the removal by crane of the convection section of a heater unit. An accident occurred when the crane's load was dropped onto a pipe connected to a storage tank which contained hydrofluoric acid, a substance identified by the United States Environmental Protection Agency as a toxic waste.[2] CBI claims that Marathon, in contravention of standard industry practices, had failed to empty the storage tank prior to the commencement of the turnaround and that CBI was unaware of the presence of hydrofluoric acid in the tank prior to the accident.

In numerous lawsuits brought against CBI and others in connection with the accident, residents of Texas City and others alleged that they were injured when a large cloud of hydrofluoric acid was released as a result of the accident. CBI tendered these claims to National Union, Anglo American and Rome. All of the companies denied coverage and CBI filed this suit.

The insurance companies moved for summary judgment on the ground that the "absolute pollution exclusions" in their policies precluded coverage as a matter of law. CBI argued in response that the policies, by virtue of these exclusions, contained both patent and latent ambiguities. The trial court granted summary judgment for the insurance companies before CBI had the opportunity to obtain any documents through the discovery process. However, the trial court did accept for the record certain insurance industry documents which, CBI contends, indicate that "absolute pollution exclusions" such as those involved in this case are ambiguous and will not be read literally to exclude coverage for every situation involving the discharge of pollutants.[3]

---

1. CBI Na–Con, Inc. was an additional named insured on all of the insurance policies at issue in this case.

2. 40 C.F.R. § 261.33(f) (1992).

3. For example, during testimony at a 1985 hearing conducted by the Texas State Board of Insurance, Ward Harrel, a representative of Liberty Mutual Insurance Company, indicated that the

Insurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally. *See Forbau v. Aetna Life Insurance Company,* 876 S.W.2d 132 (Tex.1994); *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex.1987). The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *Forbau,* 876 S.W.2d at 133. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *see also Universal C.I.T. Credit Corp. v. Daniel,* 243 S.W.2d 154, 157 (Tex. 1951). Parol evidence is not admissible for the purpose of creating an ambiguity. *See Universal,* 243 S.W.2d at 157; *Lewis v. East Texas Finance Co.,* 136 Tex. 149, 146 S.W.2d 977, 980 (1941).

If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. *See Glover v. National Insurance Underwriters,* 545 S.W.2d 755, 761 (Tex.1977); *see also Coker,* 650 S.W.2d at 393; *Universal,* 243 S.W.2d at 157. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *See Coker,* 650 S.W.2d at 394; *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex.1980). Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, *see Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 732 (Tex.1981), and admit extraneous evidence to determine the true meaning of the instrument. *See R & P Enterprises,* 596 S.W.2d at 518.

An ambiguity in a contract may be said to be "patent" or "latent." A patent ambiguity is evident on the face of the contract. *See Universal Home Builders, Inc. v. Farmer,* 375 S.W.2d 737, 742 (Tex.Civ.App.— Tyler 1964, no writ). A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter.[4] *See Murphy v. Dilworth,* 137 Tex. 32, 151 S.W.2d 1004 (1941); *see also Bache Halsey Stuart Shields, Inc. v. Alamo Sav. Ass'n,* 611 S.W.2d 706, 708 (Tex.Civ.App.—San Antonio 1980, no writ). If a latent ambiguity arises from this application, parol evidence is admissible for the purpose of ascertaining the true intention of the parties as expressed in the agreement. *See Murphy,* 151 S.W.2d at 1005.

In this case, the court of appeals did not decide that the contract was either patently or latently ambiguous. Rather, the court held that the trial court abused its discretion when it rendered summary judgment before allowing discovery. 860 S.W.2d at 666. On that basis alone, the court of appeals reversed and remanded to the trial court "without deciding whether there are ambiguities in the exclusions." 860 S.W.2d at 664. The court reasoned that "CBI was not given sufficient time to make reasonable attempts to discover evidence on the issue of 'applying the contract to the subject matter with which it deals,' and thereby raise a fact issue on latent ambiguity." *Id.* at 666. In support of its holding, the court summarized the industry-wide evidence in the record. *Id.* These items of evidence, the court opined, should have indicated to the trial court that with more time for discovery, CBI *"might* have raised a fact issue on latent ambiguity." *Id.* The discovery sought by CBI is of evidence that its insurers "knew and approved" of industry-wide discussions concerning the breadth of the absolute pollution exclusion and "understood that the pollution exclusions

---

pollution exclusion could be read literally to exclude coverage in situations where "no one would read it that way," noting that "our insureds would be at the State Board … quicker than a New York minute if, in fact, everytime [sic] a bottle of Clorox fell off a shelf at a grocery store and we denied the claim because it's a pollution loss."

4. For example, if a contract called for goods to be delivered to "the green house on Pecan Street," and there were in fact two green houses on the street, it would be latently ambiguous.

would not exclude coverage in construction accident situations."

 The court of appeals relies on the *Bache* decision, which held that if a latent ambiguity is discovered when "applying the contract to the subject matter with which it deals," *then* the proponent of the ambiguity may introduce parol evidence to establish the parties' intent. *Bache*, 611 S.W.2d at 708. The ambiguity must become evident when the contract is read in context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity. Neither the court of appeals' opinion nor the parties' briefs have raised any need for additional facts to apply the insurance policies to the subject matter with which they deal. The facts relating to the accident, the release of hydrofluoric acid as a result of that accident, and the personal injury and property damage claims allegedly resulting from that release appear to be fully developed. The surrounding circumstances present when the contract was entered into were amply established for the purpose of determining whether an ambiguity exists in this case on these facts. The discovery sought by CBI is not necessary for the application of the contract to its subject matter, but rather goes to the issue of the parties' interpretation of the "absolute pollution exclusion." The court of appeals erred in holding, in effect, that CBI must be allowed an opportunity to discover parol evidence going to the parties' intentions in order to create a latent ambiguity.[5]

 The question to be decided here is whether these insurance policies, by virtue of their "absolute pollution exclusions," are patently or latently ambiguous. On its face, the language of the policies is clear and not patently ambiguous. Nor are the policies latently ambiguous. Applying the policies' language to the context of the claim here does not produce an uncertain or ambiguous result, but leads only to one reasonable conclusion: the loss was caused by a cloud of hydrofluoric acid, a substance which is clearly a "pollutant" for which coverage is precluded.

CBI correctly contends that the language of the policies must be interpreted with reference to both the facts of the claim *and* the facts within the contemplation of the parties at the signing of the policies. *See Coker*, 650 S.W.2d at 394. CBI argues that extrinsic evidence (such as trade usage, prior dealings, and prior negotiations) is relevant in interpreting the policies and must be considered to ascertain whether a latent ambiguity exists. Specifically, CBI argues that extrinsic evidence concerning industry-wide discussions of the exclusion at issue here shows that the parties shared a mutual, yet unstated, intent that the exclusions would not encompass "accidental" releases of pollutants.

 Extrinsic evidence may, indeed, be admissible to give the words of a contract a meaning consistent with that to which they are reasonably susceptible, *i.e.*, to "interpret" contractual terms.[6] If the contract language is not fairly susceptible of more than one legal meaning or construction, however, extrinsic evidence is inadmissible to contradict or vary the meaning of the explicit language of the parties' written agreement. *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32 (Tex.

5. In its brief to this Court, CBI argues that the insurance companies' summary judgment proof did not establish as a matter of law that the language of the exclusions was unambiguous "in light of the surrounding circumstances," i.e. that "[t]here remained genuinely disputed issues of material fact as to whether the parties intended to apply the pollution exclusions to CBI's construction accidents." As discussed above, however, no issue regarding the parties' intentions is raised *unless* the policy is ambiguous—and evidence of those intentions cannot be used to create an ambiguity. *See Universal*, 243 S.W.2d at 157; *Lewis*, 146 S.W.2d at 980; *Murphy*, 151 S.W.2d at 1005.

CBI also contends that one of the inferences that should be made in its favor on summary judgment is that "the policies contain patent ambiguities that preclude summary judgment and cry out for discovery." Whether the policies contain ambiguities is a matter of law for the court, *see Coker*, 650 S.W.2d at 394; *R & P Enterprises*, 596 S.W.2d at 518, not an inference it must make for the purpose of deciding a summary judgment motion.

6. In cases involving "trade usage" evidence, for example, the meaning to which a certain term or phrase is most reasonably susceptible is the one which so regularly observed in place, vocation, trade, or industry so "as to justify an expectation that it will be observed with respect to a particular agreement." Restatement (2d) of Contracts § 222(1). *See also* Tex.Bus. & Com.Code § 1.205(b).

**522**

1958); *Lewis,* 146 S.W.2d at 980. In this case, the policies unequivocally deny coverage for damage resulting from pollutants, however the damage is caused.[7] The relevant facts and extrinsic evidence necessary to apply this contract exclusion language to the subject matter with which it deals in this case reveals no latent ambiguity.

Courts usually strive for uniformity in construing insurance provisions, especially where, as here, the contract provisions at issue are identical across the jurisdictions. Most courts which have examined the same or substantially similar absolute pollution exclusions have concluded that they are clear and unambiguous.[8] "This pollution exclusion is just what it purports to be—absolute ..." *Alcolac,* 716 F.Supp. 1546, 1549 (D.Md.1989). We agree. The language in this pollution exclusion is clear and susceptible of only one possible interpretation in this case. Because there are no latent or patent ambiguities in the policies, there are no fact issues that merit discovery. We conclude that the record is sufficiently developed to support the trial court's summary judgment in favor of the defendant insurance companies. Accordingly, we reverse the judgment of the court of appeals and affirm the judgment of the trial court.

---

**7.** The National Union policy applies to "any" pollution, and the Anglo American and Rome policies apply to pollution "however caused."

**8.** *See, e.g., Heyman Assoc. No. 1 v. Insurance Co. of State of Pennsylvania,* 231 Conn. 756, 653 A.2d 122 (1995); *Crescent Oil Co. Inc. v. Federated Mut. Ins. Co.,* 20 Kan.App.2d 428, 888 P.2d 869 (1995); *Independent Sch. Dist. No. 197, W.R. Grace & Co. v. Accident and Casualty Ins. of Winterthur,* 525 N.W.2d 600 (Minn.Ct.App.1995); *Essex Ins. Co. v. Tri–Town Corp.,* 863 F.Supp. 38 (D.Mass.1994); *Blackhawk–Central City Sanitation Dist. v. American Guarantee & Liab. Ins. Co.,* 856 F.Supp. 584 (D.Colo.1994); *Larsen Oil Co. v. Federated Serv. Ins. Co.,* 859 F.Supp. 434 (D.Or. 1994); *American States Ins. Co. v. F.H.S., Inc.,* 843 F.Supp. 187 (S.D.Miss.1994); *American States Ins. Co. v. Skrobis Painting & Decorating, Inc.,* 513 N.W.2d 695 (Wis.Ct.App.1994); *Demakos v. Travelers Ins. Co.,* 205 A.D.2d 731, 613 N.Y.S.2d 709 (1994); *Union Mut. Fire Ins. Co. v. Hatch,* 835 F.Supp. 59 (D.N.H.1993); *Damar,* *Inc. v. U.S. Fire Ins. Co.,* 856 F.Supp. 679 (N.D.Ga.1993); *O'Brien Energy Systems, Inc. v. American Employer's Ins. Co.,* 427 Pa.Super. 456, 629 A.2d 957 (1993); *Vantage Dev. Corp. v. American Env't Technologies Corp.,* 598 A.2d 948 (N.J.Super.Ct.Law Div.1991); *Great Northern Ins. Co. v. Benjamin Franklin Fed. Sav. and Loan Ass'n,* 793 F.Supp. 259 (D.Or.1990), *aff'd,* 953 F.2d 1387 (table) (9th Cir.1992); *Budofsky v. The Hartford Ins. Co.,* 147 Misc.2d 691, 556 N.Y.S.2d 438 (Sup.Ct.1990); *Alcolac Inc. v. California Union Ins. Co.,* 716 F.Supp. 1546 (D.Md.1989); *Hydro Systems v. Continental Ins. Co.,* 717 F.Supp. 700 (C.D.Cal.1989), *aff'd,* 929 F.2d 472 (9th Cir. 1991); *League of Minn. Cities Insurance Trust v. City of Coon Rapids,* 446 N.W.2d 419 (Minn.Ct. App.1989); *Guilford Ind. Inc. v. Liberty Mut. Ins. Co.,* 688 F.Supp. 792 (D.Me.1988). *But see, e.g., Minerva Enterprises v. Bituminous Cas. Corp.,* 312 Ark. 128, 851 S.W.2d 403 (1993); *West American Ins. Co. v. Tufco Flooring East, Inc.,* 104 N.C.App. 312, 409 S.E.2d 692 (1991).