WESTERN ALLIANCE INSURANCE
COMPANY, Plaintiff,

v.

NORTHERN INSURANCE COMPANY
OF NEW YORK, Defendant.

Civil Action No. 3:96–CV–0905–G.

United States District Court,
N.D. Texas,
Dallas Division.

June 27, 1997.

Barry Hedges Fanning, Cathlynn Harrelson Cannon, Randall Dixon Fife, Fanning Harper & Martinson, Dallas, TX, for plaintiff.

Bryan Roger Haynes, Liddell Sapp Zivley Hill & LaBoon, Dallas, TX, Richard Brent Cooper, Cooper Aldous & Scully, Dallas, TX, for defendant.

### MEMORANDUM ORDER

FISH, District Judge.

Before the court are the motions of the plaintiff Western Alliance Insurance Company ("Western Alliance") for partial summary judgment and of the defendant Northern Insurance Company ("Northern") for summary judgment. For the following reasons, Western Alliance's motion is granted, and Northern's motion is denied.

## I. BACKGROUND

The Federal Deposit Insurance Corporation ("FDIC") hired C.W. Sparks ("Sparks") and/or the C.W. Sparks Management Company to manage on its behalf a house located at 918 West Seventh Street in Dallas, Texas (the "Property"). Plaintiff Western Alliance Insurance Company's First Amended Original Complaint ("Complaint") ¶ 5; Northern Insurance Company of New York's Motion for Summary Judgment ("Northern Motion") at 1.

From February 1, 1991 to February 1, 1992, Northern provided coverage to the FDIC on the Property under the terms of its commercial insurance policy number EC86553153 (the "Northern Policy"). Complaint ¶ 6; see also Northern Motion, Exhibit B. The Northern Policy's limit was $1,000,-000. Northern Motion, Exhibit A, Affidavit of Robert Pileggi ("Pileggi Affidavit") ¶ 3. Northern also issued the FDIC an umbrella policy number UB61935913 (the "Umbrella Policy"). Complaint ¶ 6; see also Northern Motion, Exhibit C. The policy limit on the Umbrella Policy was $10,000,000. Pileggi Affidavit ¶ 3. Both policies provided that Sparks, as an FDIC real estate manager, was an additional insured. Complaint ¶ 6. Northern admits that Sparks was an additional insured according to the terms of the

Northern Policy "but solely for his real estate management activities." Defendant Northern Insurance Company of New York's Response to Plaintiff's Motion for Partial Summary Judgment ("Northern Response") at 4. The Northern Policy stated that:

1. Insuring Agreement

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

Northern Policy, Section I—Coverages, Coverage A. Bodily Injury and Property Damage Liability.

Sparks was also covered by an additional insurance policy, number TCX314688, issued by Western Alliance for the policy period of September 14, 1991 to September 14, 1992 (the "Western Alliance Policy"). Complaint ¶ 7; *see also* Northern Motion, Exhibit E. The Western Alliance Policy listed the insured as C.W. Sparks d/b/a C.W. Sparks Management Company and Southern Building Restoration. *See* Western Alliance Policy, Texas Commercial Package Policy Change Endorsement. The Western Alliance Policy's limits were $500,000. Plaintiff Western Alliance Insurance Company's Motion for Partial Summary Judgment ("Western Alliance Motion") ¶ 8. The Western Alliance Policy included an endorsement which stated:

The insurance does not apply to "property damage" to property you operate or manage or as to which you act as agent for the collection of rents or in any other supervisory capacity.

With respect to your liability arising out of your management of property for which you are acting as real estate manager this insurance is excess over any other valid and collectible insurance available to you.

Western Alliance Policy, Real Property Managed Endorsement.

On or about October 7, 1991, a fire occurred at the Property, and five of its occupants died in the fire. Complaint ¶ 5. The decedents were renting the Property from the FDIC on the date of the fire. Western Alliance Motion at 4. Both Northern and Western Alliance were advised of the fire's occurrence on October 7, 1991. Complaint ¶ 8.

On October 18, 1991, Mike Milvo, a Western Alliance senior claims examiner, informed Sparks that "[i]f the [P]roperty owner ... [has] liability insurance, or if there is any other available and collectable insurance available to you, [the Western Alliance] policy would be excess." Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Partial Summary Judgment ("Western Alliance Reply"), Exhibit C, Letter of Mike Milvo dated October 18, 1991.

On or about October 23, 1991, the decedents' survivors sued Aid Consulting Engineers, Inc. and C.W. Sparks Enterprises, Inc. in the 193rd Judicial District Court of Dallas County, Texas (the "Sparks suit").[1] Complaint ¶ 9; Western Alliance Motion ¶ 6; *see also id.*, Exhibit D, Plaintiffs' First Amended Original Petition for Injunction and Damages. The survivors later amended their petition to name Sparks as the only defendant, individually and in his capacities as sole proprietor of both C.W. Sparks Management Company and Southern Building and Restoration. *See id.*, Exhibit E, Plaintiffs' Second Amended Original Petition; *see also id.*, Exhibit F, Plaintiffs' Third Amended Original Petition ("Third Amended Petition"). The suit alleged that Sparks negligently installed a water heater and failed to install a smoke detector in the Property. Western Alliance Motion at 5; Third Amended Peti-

---

1. Cause Number 91–12545–L.

tion ¶¶ XVIII, XX. Northern maintains that Sparks Management Company and Southern Building and Restoration were not additional insureds under the Northern Policy. Northern Response at 4.

Thereafter, Western Alliance determined that it had no obligation to indemnify or defend Sparks in the Sparks suit based on the endorsement provision of its policy which made the Western Alliance Policy excess to the Northern Policy. Complaint ¶ 9; Western Alliance Motion ¶ 6. Nevertheless, Western Alliance defended Sparks while it formally demanded—on or about November 1, 1991, on December 31, 1991, and on January 7, 1992—that Northern take over Spark's defense pursuant to the terms of the Northern Policy. Complaint ¶ 10; Western Alliance Motion ¶ 7; Northern Response, Letter of Mike Milvo dated January 7, 1992; *id*, Letter of Barry H. Fanning and James Brandon Bradley dated December 31, 1991 ("Fanning Letter"); Western Alliance Reply, Exhibit A, Declaration of Mike Milvo ("Milvo Declaration") at 2; *see also* Plaintiff Western Alliance Insurance Company's Response to Defendant's Motion for Summary Judgment ("Western Alliance Response"), Exhibit A, Declaration of James Bradley ("Bradley Declaration"). Northern informed Western Alliance that it needed additional time to investigate the matter before it would agree to defend Sparks. Complaint ¶ 10; Western Alliance Motion ¶ 7.

During March 1992, Sparks told Western Alliance that the claims against him could be settled for $525,000. Complaint ¶ 11; Western Alliance Motion ¶ 8. Because the limits of the Western Alliance Policy were $500,000 and because it claimed it had no duty to defend or indemnify Sparks, Western Alliance demanded on March 11, 1992 and on March 17, 1992, that Northern defend and indemnify Sparks. Western Alliance Motion ¶ 8; Milvo Declaration at 2; *id.*, Exhibit B, Letter of Mike Milvo dated March 17, 1992 ("March 17, 1992 Milvo Letter"). On March 17, 1992, Sparks reached a settlement with the Sparks suit plaintiffs. Bradley Declaration; Milvo Declaration at 2. On March 20, 1992, Northern agreed to contribute $25,000 toward the settlement of the Sparks suit. Complaint ¶ 11; Milvo Declaration at 2; Western Alliance Motion, Exhibit I, Letter of Mike Milvo dated March 20, 1992 ("March 20, 1992 Milvo Letter"); *see also* Defendant Northern Insurance Company of New York's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Northern Reply") at 5.

On March 24, 1992, the Sparks suit plaintiffs dismissed the suit and executed a document in which they agreed to settle the Sparks suit for $525,000 in exchange for a complete release of each defendant. Northern Motion at 2; *see also id.*, Exhibit D, Release and Settlement Agreement; Bradley Declaration.[2] Western Alliance defended Sparks and ultimately indemnified him for $500,000. Western Alliance Response at 3. Pursuant to the parties' agreement, Northern paid $25,000 from the policy limit of the Northern Policy and agreed that Northern and Western Alliance would mediate the dispute regarding the balance of the $500,000. Milvo Declaration at 2. Western Alliance and Northern also agreed to submit their disputes regarding coverage obligations to "ADR mediation" after the conclusion of all claims filed against the FDIC in connection with the fire. Complaint ¶ 11; March 20, 1992 Milvo Letter.

On March 25, 1992, the survivors sued the FDIC in the 193rd Judicial District Court of Dallas County, Texas ("the FDIC suit"). *See* Western Alliance Motion, Exhibit G, Plaintiffs' Fourth Amended Original Petition. On April 17, 1992, the FDIC removed the suit to the United States District Court for the Northern District of Texas, Dallas Division.[3] Northern Motion at 2. On May 7, 1992, the survivors amended their complaint and added the United States of America as a defendant.

---

**2.** The parties agree that the Sparks suit settled for the sum of $525,000. *See, e.g.,* Milvo Declaration at 2; Northern Motion at 2. However, the Sparks suit settlement and release agreement states that the amount due under the agreement was $500,000. *See* Northern Motion, Exhibit D, Release and Settlement Agreement.

**3.** Cause Number 3:92–CV–0765–T.

On December 30, 1993, the plaintiffs settled the FDIC suit. Northern Reply at 6. On February 8, 1994, that settlement became final. *Id.;* Northern Motion at 2; *see also* Pileggi Affidavit, Exhibit 1, Settlement Agreement and Release, First Amendment of Settlement Agreement and Release. Northern paid more than $1,000,000 to settle the FDIC suit. Pileggi Affidavit ¶ 7. In so doing, Northern exhausted the limits of the Northern Policy and used additional funds from the Umbrella Policy. Northern Reply at 3. Specifically, Northern paid $975,000 from the Northern Policy to settle the FDIC suit, and amounts above $975,000 were paid out of the policy limits of the Umbrella Policy. Pileggi Affidavit ¶ 7.

Western Alliance maintains that Northern was responsible for defending Sparks in the Sparks suit. Complaint ¶ 13. Because Western Alliance, and not Northern, paid for Sparks's defense and costs associated with the Sparks suit, Western Alliance argues that Northern should reimburse it for its payment of the defense and settlement costs. *Id.;* Western Alliance Response ¶ 6. Western Alliance contends that two years after Northern breached its contract with Sparks, Northern exhausted the Northern Policy on another claim—the FDIC suit. Western Alliance Response ¶¶ 12–13. Specifically, Western Alliance claims that at the time Western Alliance paid $500,000 to settle the Sparks suit, Northern had $1,000,000 available to it under the Northern Policy. *Id.* ¶ 11. Because Northern did not tender the funds available under the Northern Policy, Western Alliance maintains, Northern breached its contract with Sparks and forced Western Alliance to fund the settlement. *Id.* ¶¶ 11–12.

Northern, on the other hand, claims that as a result of settling claims related to the FDIC and Sparks suits, the policy limits of the Northern Policy were completely exhausted. Northern Motion at 2, 5. Therefore, Northern argues, Western Alliance may not recover any money under the Northern Policy. *Id.* at 5. Furthermore, Northern maintains that Western Alliance's policy is not excess to Northern's Umbrella Policy, so

that Western Alliance cannot recover anything under that policy either. *Id.*

On February 23, 1996, Western Alliance filed this suit in the 14th Judicial District Court of Dallas County, Texas. Notice of Removal ¶ I; *see also id.,* Exhibit A, Plaintiff's Original Petition. On April 1, 1996, Northern removed the case to this court pursuant to 28 U.S.C. § 1332, as the citizenship of the parties is diverse. *Id.* ¶ II. On September 23, 1996, Western Alliance amended its complaint. In that complaint, Western Alliance brought a cause of action in subrogation for breach of contract. Complaint ¶ 13.

As stated above, at the time that Western Alliance and Northern agreed that Northern would contribute $25,000 toward the settlement of the Sparks suit, they also agreed to mediate their coverage obligation issues after the conclusion of claims asserted against the FDIC in connection with the fire. On February 8, 1994, the FDIC suit settled. Complaint ¶ 12. In accordance with their agreement, Western Alliance asked Northern to attend a mediation session, but as of September 23, 1996, Northern had refused to attend. *Id.;* Western Alliance Motion ¶ 9.

## II. *ANALYSIS*

### A. *Evidentiary Burdens on a Motion for Summary Judgment*

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A movant for summary judgment makes such a showing by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues to support the nonmovant's case. *Celotex Corporation*

*v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The pleadings, depositions, admissions, and affidavits, if any, must demonstrate that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c).

Once the movant makes this showing, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. To carry this burden, the "opponent must do more than simply show ... some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the nonmovant must present evidence sufficient to support a resolution of the factual issue in its favor. *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15. While all of the evidence must be viewed in a light most favorable to the motion's opponent, *id.* at 255, 106 S.Ct. at 2513–14 (citing *Adickes v. S.H. Kress & Company,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)), the opponent may not rely on conclusory allegations to support or defeat a motion for summary judgment. *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

Summary judgment is properly entered against an opposing party if after adequate time for discovery, that party fails to establish the existence of an element essential to its case and as to which it will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### B. *Insurance Policy Interpretation Under Texas Law*

■ In *National Union Fire Insurance Company of Pittsburgh, Pennsylvania v. CBI Industries, Inc.,* 907 S.W.2d 517 (Tex. 1995), the Texas Supreme Court summarized the approach courts must take when interpreting insurance contracts. "Insurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally." *Id.* at 520; see also *Nutmeg Insurance Company v. Pro–Line Corporation,* 836 F.Supp. 385, 388 (N.D.Tex.1993)

(citing *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991)). "The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *CBI Industries,* 907 S.W.2d at 520 (citation omitted). In determining the intent of the parties, the court construes the policy to give effect to each of its terms and to avoid rendering any term meaningless. *Ideal Mutual Insurance Co. v. Last Days Evangelical Association, Inc.,* 783 F.2d 1234, 1238 (5th Cir.1986) (citation omitted).

■ In construing a contract, the court must determine whether its meaning is ambiguous. "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole...." *CBI Industries,* 907 S.W.2d at 520; see also *Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Insurance Company,* 832 F.2d 1358, 1364 (5th Cir.1987). A written contract is ambiguous if its language "is subject to two or more reasonable interpretations" but is not ambiguous if it is "so worded that it can be given a definite or certain legal meaning." *CBI Industries,* 907 S.W.2d at 520 (citations omitted). Mere disagreement between the parties about the correct interpretation of the term will not render the term ambiguous, nor will it transform the issue of law into an issue of fact. *D.E.W., Inc. v. Local 93, Laborers' International Union of North America,* 957 F.2d 196, 199 (5th Cir.1992) (citations omitted).

■ Where a policy term is ambiguous, the court will construe that term in favor of the insured. *Toops v. Gulf Coast Marine Inc.,* 72 F.3d 483, 486 (5th Cir.1996) (quoting *Adams v. John Hancock Mutual Life Ins. Co.,* 797 F.Supp. 563, 567 (W.D.Tex.1992) [*aff'd,* 49 F.3d 728 (5th Cir.1995) (table) ] ). In addition, when construing a policy term that excludes or limits coverage, the court must adopt any reasonable interpretation of the exclusion urged by the insured, even if the interpretation of the insurer appears more reasonable or a more accurate reflection of the parties' intent. *Id.*

■ These rules of construction, however, apply only when the terms of the policy are ambiguous. *Ranger Insurance Company v. Bowie,* 574 S.W.2d 540, 542 (Tex.1978) (citations omitted); see also *Pride v. State Farm Fire & Casualty Insurance Company,* 434 S.W.2d 146, 149 (Tex.Civ.App.—Amarillo 1968, no writ). The court will not alter the clear terms of an insurance policy or strain to find an ambiguity where none exists. *Calcasieu–Marine National Bank of Lake Charles v. American Employers' Insurance Co.,* 533 F.2d 290, 296 (5th Cir.), *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976) (Louisiana law); *Vest v. Gulf Insurance Company,* 809 S.W.2d 531, 533 (Tex.App.—Dallas 1991, writ denied). See *State Farm Life Insurance Company v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995) ("Only if an insurance policy remains ambiguous despite [ordinary] canons of [contract construction] should courts construe its language against the insurer in a manner that favors coverage").

The court must decide the question of ambiguity by "looking at the contract as a whole...." *CBI Industries,* 907 S.W.2d at 520. Once a court determines that a contract term is not ambiguous, it must then determine that contract's "plain meaning." *Puckett v. U.S. Fire Insurance Co.,* 678 S.W.2d 936, 938 (Tex.1984) (citation omitted). "The

intent of the policy may be evidenced by its stated coverage, the premiums paid for it, and its wording concerning excess insurance." *Utica National Insurance Company of Texas v. Fidelity & Casualty Company of New York,* 812 S.W.2d 656, 662 (Tex.App.—Dallas 1991, writ denied) (citation omitted). When each of the policies in issue here is viewed as an integrated whole, the court concludes that its language may be given a "definite [and] certain legal meaning" and is therefore not ambiguous. *CBI Industries,* 907 S.W.2d at 520; see also *Certain Underwriters at Lloyd's London v. C.A. Turner Construction Company, Inc.,* 941 F.Supp. 623, 629 (S.D.Tex.1996), *aff'd,* 112 F.3d 184 (5th Cir.1997).

*C. The Duty to Defend and to Indemnify*

■ Western Alliance contends that Northern's duty to defend Sparks arose on October 23, 1991, the day that the Sparks suit was filed, and that its duty to indemnify arose on March 24, 1992, the day that the settlement funds were disbursed in that case.[4] Western Alliance Reply at 3.[5] On November 1, 1991, December 31, 1991, January 7, 1992, March 11, 1992, and March 17, 1992, Western Alliance demanded that Northern defend or indemnify Sparks in connection with the Sparks suit.[6] Milvo Declaration at 2; March 17, 1992 Milvo Letter.

**4.** The duty to defend and the duty to indemnify are separate and distinct duties which create separate and distinct causes of action. *American Alliance Insurance Company v. Frito–Lay, Inc.,* 788 S.W.2d 152, 153 (Tex.App.—Dallas 1990, writ dism'd) (citation omitted). The duty to indemnify, unlike the duty to defend, is based not upon the pleadings, *see* below, but upon the actual facts which underlie the suit. *Id.*

**5.** Contrary to Northern's argument, Western Alliance was not obligated to apportion the settlement. Northern Response at 17. See *Warehouse Partners v. Gardner,* 910 S.W.2d 19, 24 (Tex.App.—Dallas 1995, writ denied) ("Texas law does not recognize a distinction between an individual and his sole proprietorship"). Even is it is assumed *arguendo,* however, that Western Alliance had some obligation to apportion the settlement, Northern manifested its intent, in its letter agreement dated March 20, 1992, that the settlement should include a release of claims against C.W. Sparks d/b/a C.W. Sparks Management Company and Southern Building Restoration. In that letter, Northern agreed to contribute $25,000 toward settlement of the Sparks suit and

also consented that "Western Alliance Insurance Company will undertake settlement procedures with all potential plaintiffs for their claims against C.W. Sparks, C.W. Sparks Management Company, Southern Building and Restoration, C.W. Sparks Enterprises, Inc., ... and other dbas and affiliated companies." March 20, 1992 Milvo Letter.

**6.** Northern alleges that Western Alliance's breach of contract claim is barred by the statute of limitations. Northern Response at 16. The statute of limitations on a breach of contract action for the wrongful refusal to defend an insurance claim is four years. *Whatley v. City of Dallas,* 758 S.W.2d 301, 310 (Tex.App.—Dallas 1988, writ denied) (citations omitted). A cause of action for the wrongful refusal to defend accrues at the time the refusal to defend occurs. *Id.* Apparently, Northern never explicitly refused to defend the Sparks suit; rather, it simply ignored repeated requests for such a defense, saying that it needed more time to investigate. The last date on which Northern did not respond to a request for defense of the Sparks suit was March

■ Under Texas law, an insurer's duty to furnish a defense to its insured is determined "by the allegations of the petition when considered in the light of the policy provisions without reference to the truth or falsity of such allegations." *Argonaut Southwest Insurance Company v. Maupin*, 500 S.W.2d 633, 635 (Tex.1973) (citations omitted). The insurer must defend if the allegations, construed liberally in favor of the insured, state a claim which could potentially give rise to coverage under the policy. *Heyden Newport Chemical Corporation v. Southern General Insurance Company*, 387 S.W.2d 22, 26 (Tex.1965). Parties to a coverage lawsuit may not go outside the pleadings to introduce extrinsic evidence pertaining to coverage issues, if the refusal to defend is based on the ground that the insurer is not liable to the insured. *Gonzales v. American States Insurance Company of Texas*, 628 S.W.2d 184, 187 (Tex.App.—Corpus Christi 1982, no writ). "An insurer's breach of its contractual duty to defend its insured, like any breach of contract, may give rise to liability for all damages directly and foreseeably resulting from the breach." *Whatley*, 758 S.W.2d at 309.

■ The court finds that the Sparks suit petition alleged facts which implicated coverage under the Northern policy. Thus, Northern had a duty to defend Sparks in the Sparks suit.

### D. *Primary and Excess Insurance Policies*

■ The Western Alliance Policy clearly states that it is "excess over any other valid and collectible insurance." Western Alliance Policy, Real Property Managed Endorsement. Under Texas law, an excess insurance carrier, such as Western Alliance, may bring an equitable subrogation action against a primary insurance carrier, such as Northern. See *American Centennial Insurance Compa-*

*ny v. Canal Insurance Company*, 843 S.W.2d 480, 483 (Tex.1992); *Argonaut Insurance Company v. Allstate Insurance Company*, 869 S.W.2d 537, 543 (Tex.App.—Corpus Christi 1993, writ denied); *International Insurance Company v. Dresser Industries, Inc.*, 841 S.W.2d 437, 445 (Tex.App.—Dallas 1992, writ denied) (citation omitted). "[T]he doctrine of subrogation is given a liberal application and is broad enough to include every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity and good conscience should have been discharged by the latter." *Argonaut*, 869 S.W.2d at 541–42.[7]

According to the Fifth Circuit,

Excess liability insurers contract to provide inexpensive insurance with high policy limits by requiring the insured to contract for primary insurance with another carrier. The premium is also held down by the fact that the duty to defend rests primarily on the primary insurer, falling on the excess liability carrier only when the primary carrier is not required to defend because the loss is not covered by the primary policy.

*Harville v. Twin City Fire Insurance Company*, 885 F.2d 276, 278–79 (5th Cir.1989).

■ It is clear that under Texas case law, a primary policy must first be exhausted to cover a loss before an excess policy becomes liable. *St. Paul Mercury Insurance Company v. Lexington Insurance Company*, 888 F.Supp. 1372, 1381–82 (S.D.Tex.1995) (citations omitted); *Westchester Fire Insurance v. Heddington Insurance Ltd.*, 883 F.Supp. 158, 164 n. 10 (S.D.Tex.1995) ("Under Texas law, [even] a primary policy with an 'other insurance' clause must be exhausted before an excess policy applies.") (citation omitted), *aff'd*, 84 F.3d 432 (5th Cir.1996) (table); *Utica*, 812 S.W.2d at 657 n. 1 ("As between a primary policy and an excess policy, the primary policy is exhausted first to cover a

17, 1992. *See* March 17, 1992 Milvo Letter. Western Alliance filed this suit on February 26, 1996, less than four years after this last request to provide a defense was ignored. Therefore, Western Alliance's claim is not time barred.

**7.** As Northern argues, the Western Alliance Policy could not have been excess to the Umbrella

Policy, therefore, Western Alliance may not seek reimbursement from that policy. Northern Motion at 11–12. See *Carrabba v. Employers Casualty Company*, 742 S.W.2d 709, 715 (Tex.App.—Houston [14th District] 1987, no writ) (citation omitted).

loss."); see also *Federal Insurance Co. v. Srivastava*, 2 F.3d 98, 102 (5th Cir.1993). Therefore, the Northern Policy should take the priority under the plain language of the policies. The Western Alliance Policy is purely an excess policy which did not apply until the costs associated with settlement of claims related to the fire exceeded $1,000,000. See *Westchester*, 883 F.Supp. at 164; see also *id.* at n. 11.

Northern does not deny that the Northern Policy should be exhausted before the Western Alliance Policy applies. Northern Motion at 10. To the contrary, Northern argues that because the Northern Policy's limits are *now* exhausted, Western Alliance is not entitled to reimbursement from Northern. *Id.;* Northern Response at 12–13. Under Texas law, once the limits of the primary policy are exhausted, the excess policy is triggered. *St. Paul Mercury*, 888 F.Supp. at 1381. Northern submits that it "only had the duty to expend up to its policy limits on the payment of claims asserted against its insureds and covered under the policy [, and Northern] did just that, tendering its full primary policy limits in the settlement of the claims and litigation arising out of the October 7, 1991, house fire." Northern Response at 13.

■■■■ Acceptance of this argument would give a primary insurer every incentive to drag its feet in settling claims, as recognized in *Union Indemnity Insurance Co. of New York v. Certain Underwriters at Lloyd's*, 614 F.Supp. 1015 (S.D.Tex.1985):

> If the existence of excess insurance relieved a primary insurer of its responsibility to negotiate and settle up to its policy limits in good faith, then the primary insurer would have a disincentive to settlement. Moreover, if during settlement negotiations the primary insurer is allowed to force the excess insurer to cover part of the primary's insurance exposure, the coverages and rate structures of the two different types of insurance—primary and excess—would be distorted, and excess insurance premiums would have to be adjusted. On the other hand, allowing an excess insurer to enforce a primary carrier's duty to negotiate and settle in good faith to the full limits of the primary carri-

er's policy does not add to or change that carrier's duties. Indeed, courts in this Circuit as well have held that a primary insurance carrier owes a duty to its assured and to the excess insurer to settle the case in good faith.

*Id.* at 1018 (citations omitted); see also *Certain Underwriters of Lloyd's v. General Accident Insurance Company of America*, 699 F.Supp. 732, 740 (S.D.Ind.1988) ("An excess carrier owes no duty to the insured nor to the primary carrier either to defend the insured or to enter into settlement negotiations.") (citations omitted), *aff'd,* 909 F.2d 228 (7th Cir.1990).

■■■■ The court may assume that "[s]ince, as an excess carrier, [Western Alliance] was secondarily liable, its payment on behalf of [Northern] was presumptively involuntary." *Argonaut*, 869 S.W.2d at 543 (citations omitted). The court concludes that Western Alliance has met its burden of demonstrating that under Texas law, Northern had a duty to defend and indemnify Sparks in the Sparks suit; that the Northern Policy was primary; that the Western Alliance Policy was excess to the Northern Policy; and that at the time that Western Alliance negotiated the Sparks suit settlement, the Northern Policy had not been exhausted. Under these circumstances, Western Alliance is entitled to reimbursement for the money it paid to settle the Sparks suit on behalf of Sparks. See *Emscor Manufacturing, Inc. v. Alliance Insurance Group*, 879 S.W.2d 894, 912 (Tex. App.—Houston [14th District] 1994, writ denied); see also *Hocker v. New Hampshire Insurance Company*, 922 F.2d 1476, 1485 (10th Cir.1991); *id.* at n. 9.

### III. CONCLUSION

Accordingly, Western Alliance's motion for partial summary judgment is **GRANTED**, and Northern's motion for summary judgment is **DENIED**.

**SO ORDERED.**