IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 8, 2008

Charles R. Fulbruge III
Clerk

No. 06-11088

B HALL CONTRACTING INC, doing business as Hall Contracting Services

Plaintiff-Appellant

v.

EVANSTON INSURANCE COMPANY

Defendant-Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:06-CV-50

Before JOLLY, DAVIS, and WIENER, Circuit Judges.

PER CURIAM:[*]

In this insurance coverage dispute, B. Hall Contracting ("Hall") appeals the district court's grant of summary judgment in favor of Evanston Insurance Company ("Evanston"). We VACATE the grant of summary judgment and REMAND for further proceedings.

I.

Evanston issued a comprehensive general liability insurance policy ("Policy") to Hall, for a one-year term, in January 2003. The Policy obligates

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Evanston to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," and provides that Evanston "will have the right and duty to defend the insured against any 'suit' seeking those damages."

When Hall purchased the Policy, Hall requested a "Roofing-Commercial" classification as one of its "Hazards/Insured Classification(s)." The "Roofing Endorsement" of the Policy, however, states, in pertinent part, that the coverage under the policy "does not apply to 'bodily injury,' 'property damage,' 'personal injury,' . . . or any injury, loss or damage arising out of: . . . Any operations involving any hot tar, wand, open flame, torch or heat applications, or membrane roofing." In short, for our purposes today, the Policy provides roofing coverage but under the Roofing Endorsement excludes that coverage for "membrane roofing."

In October 2003, Hall was performing carpentry, roofing, and painting work on the campus of the University of Texas at Arlington ("UTA"). Hall was a subcontractor on a project to demolish a structure housing, among other things, UTA's main electrical switchgear. Hall was not subcontracted to demolish the structure itself; one of Hall's tasks, though, was to install a roofing system above the switchgear room inside the main structure such that it would be protected from the weather and remain operational while and after the larger building was demolished.[1]

The roofing system to be installed for this purpose was a type of membrane roofing known as ethylene propylene diene monomer ("EPDM"). Further, the roofing system was to be installed using a "cold" application EPDM roofing

---

[1] The district court's opinion indicates that Hall hired a sub-subcontractor to install the roof above the switchgear room. The parties' briefing to this court has not indicated the same, nor has it indicated that this distinction is relevant to the issues raised on appeal.

material. No heat source—such as "hot tar, wand, open flame, torch or heat applications"—was required for this application.

On October 24, while Hall was installing the membrane roofing above the switchgear room, other contractors were carrying on with the demolition of the larger building. The demolition workers' efforts generated sparks that allegedly fell onto the membrane roof and ignited a fire.

As a result of this fire, two Texas state lawsuits were filed naming Hall as a defendant. Evanston refused to assume the duty to defend Hall in the two lawsuits. Evanston argued that the claims were not covered by the Policy because the Roofing Endorsement excludes claims arising from operations involving membrane roofing.

Before the district court, Hall sought a declaratory adjudication of its rights under the Policy. Both parties moved for summary judgment. The district court granted summary judgment to Evanston, concluding that Evanston has no duty to defend Hall in the two state lawsuits.

The district court's grant of summary judgment rests on several grounds. We need only refer to the first, as our disagreement with the district court as to this first issue is dispositive.

The district court held that the Roofing Endorsement "unambiguously" excludes any operations involving any membrane roofing. The district court did not define "membrane roofing," stating that "[i]n the final analysis, the only thing relevant to this case . . . is that the roofing operation in which Hall was engaged at the time of the fire was, indeed, an operation involving membrane roofing."

II.

Hall contends that the district court erred by granting summary judgment in favor of Evanston. Hall argues, inter alia, that "membrane roofing" is a

specialized, industry-specific term that should be interpreted via reference to evidence of trade usage and industry meaning.

III.

We review whether an insurer has a duty to defend its insured in an underlying suit as a de novo question of law. Northfield Ins. Co. v. Loving Home Care, Inc., 363 F.3d 523, 527 (5th Cir. 2004).

In this diversity case we apply the substantive insurance law of Texas. Texas courts interpret insurance policies according to the rules of construction that apply to contracts generally. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995).

When interpreting a contract, courts are to ascertain the "true intent of the parties" as expressed in the contract itself. Id. This determination is accomplished by giving words their "plain, ordinary, and generally accepted meaning" unless the contract shows that the parties "used them in a technical or different sense." Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex.1996).

Our study of the Policy, the record, the arguments of the parties, and our own attempt to resolve this case have convinced us that "membrane roofing" is a term that cannot properly be interpreted without reference to evidence of trade usage and industry meaning. The Policy insures a commercial and industrial construction and remodeling contractor—not a layman—and the term itself is a term common within the commercial roofing trade and business. The term was not defined in the Policy. As such, this term "membrane roofing" cannot be properly interpreted without some understanding of how it is used in the roofing industry.[2]

---

[2] The experts provided by Hall indicated that the term is a specialized commercial roofing term. Precedent suggests that, in this circumstance, we should consider the term in its specialized industry context. See, e.g., Canutillo School Dist. v. Nat. Union Fire Ins. Co.,

Although the insured provided expert affidavits concerning membrane roofing, neither party provided a comprehensive definition of that term as it is understood in the commercial roofing industry.[3] Hall argues that under the Roofing Endorsement, which excludes "loss or damage arising out of . . . [a]ny operations involving any hot tar, wand, open flame, torch or heat applications, or membrane roofing," the words immediately preceding "membrane roofing" describing various heat applications modify the term "membrane roofing." We disagree. The proximity of the words describing roofing operations involving heat applications does not indicate that hot application membrane roofing is the only type of membrane roofing excluded. This is because the phrase "membrane roofing" is set off from the list of hot applications by a comma and the word "or" indicating that it is distinct of, separate from, and unrelated to the preceding list.[4]

Hall argues that this interpretation of the term proves it is ambiguous. Hall argues that exclusion of both cold and hot application membrane roofing would exclude "virtually all" roofing operations from coverage and the Roofing Endorsement would thus afford no coverage, which would lead to an absurd result. Resolution of this issue requires a technical definition of membrane roofing, i.e., the meaning of that term in the roofing industry.

---

99 F.3d 695, 700 (5th Cir. 1996) (citing Security Mut. Cas. Co. v. Johnson, 584 S.W.2d 703, 704 (Tex. 1979)); see also, Heritage, 939 S.W.2d at 121; CBI, 907 SW.2d at 521, 522 n.6; Crisalli, 177 Fed. Appx. at 421.

[3] Evanston did proffer an affidavit of an underwriter who interpreted the Roofing Endorsement in such a way that it would afford limited coverage even if all operations including membrane roofing are excluded. But the underwriter is not an expert in the construction industry and her assertion of an underwriter's understanding of the term cannot be considered in arriving at its meaning within the construction industry.

[4] Hall's effort to invoke the interpretive doctrines of ejusdem generis and noscitur a sociis are unavailing because section 3 of the Roofing Endorsement simply does not meet the requirements for either term.

The district court granted Evanston's motion for summary judgment without considering trade-usage evidence. Because Evanston relied on the "plain, ordinary, and generally accepted meaning" of the term, and because the district court decided the case on this basis, no trade-usage evidence was admitted by the district court.[5] We conclude that this ruling was error.

IV.

We therefore VACATE the district court's grant of summary judgment and REMAND this case for further proceedings not inconsistent with this opinion. On remand, the district court must allow the parties to proffer expert testimony to support their respective positions on the meaning of the term "membrane roofing," and decide the coverage question in the light of that testimony and other properly admitted evidence.

VACATED and REMANDED.

---

[5] Hall proffered roofing industry experts who testified to the trade-usage meaning of "membrane roofing." The district court, however, upon granting summary judgment in favor of Evanston, dismissed as moot Evanston's challenges to the designation of Hall's roofing-industry experts and the evidence was not admitted.

Wiener, Circuit Judge, Specially Concurring:

Given the stage of the proceedings in the district court at which summary judgment was rendered in favor of Evanston, denying coverage of the claims advanced against Hall in the two underlying state court cases, I cannot get too exercised about remanding the case for further proceedings. So, I do not dissent. I do believe, however, that remand will accomplish nothing more than the expenditure of time, effort, and funds by the parties and the waste of judicial resources at the district court level. This is because I am convinced that on remand the district court's original judgment will be replicated.

As noted above in our per curiam opinion, the Policy was issued to cover commercial contracting operations, including roofing, by an experienced and sophisticated commercial construction company with a long roofing history; and the nature of the Policy and the coverages for which it was issued make clear that at least some of the undefined terms used in the policy must be interpreted as they are understood in the commercial construction and roofing industry. Our per curiam opinion also recognizes that, despite Hall's contention, the wording of section 3 of the Roofing Endorsement is not subject to the doctrines of ejusdem generis, noscitur a sociis, or any other canon of construction that would cause the exclusion of coverage of "any operation including...membrane roofing" to be modified or in any way affected by the finite list of heat-related applications listed in that exclusion. And there are no other words of

qualification or limitation to be found anywhere in the Policy that would limit or restrict the meaning of "membrane roofing" to only those operations that involve application by fire or heat and thereby insure Hall (rather than excluding coverage) for its membrane roofing operation that was being applied "cold" when the fire broke out on the UTA project.

Neither could a total exclusion of coverage of membrane roofing operations be deemed overbroad or absurd when viewed in light of the very construction accident that produced the instant claims. Hall's supervisory employee in charge of the UTA job testified that Hall's "cold" application (1) was a membrane roofing operation — a fact acknowledged by Hall's principal owner and operator and by Hall's expert witness — and (2) involved the use of a flammable adhesive that emitted flammable fumes, which apparently ignited when sparks from another subcontractor's operations fell in their vicinity. So Evanston obviously knew what it was doing when it excluded not just any roofing operation, membrane or otherwise, that involved fire or heat applications, but also any and all membrane roofing operations, regardless of the method of application.

The intent of the parties to exclude insurance coverage of all membrane roofing becomes pellucid when section 3 is interpreted under the venerable canon of construction that instructs us to presume that the drafters would not include unnecessary words or phrases that are merely repetitious or surplusage. If the Roofing Endorsement had been intended to exclude coverage of only those

membrane roofing operations that were installed with the use of heat or fire or flame, it would indeed be redundant to expressly exclude membrane roofing in section 3 immediately after having expressly excluded any roofing operations involving heat, flame, torch, wand, etc. Obviously, the exclusion of all heat-related installations automatically excludes membrane roofing operations involving fire or heat. So, adding the unmodified term "membrane roofing" following the list of excluded flame and heat installations is meaningful — and not unnecessary surplusage or repetition — only if the exclusion of membrane roofing is intended to encompass all such operations, "cold" as well as "hot."

Finally, the record on appeal confirms that there are other categories of roofing operations that are not membrane roofing operations — metal and tile, to name but two others that were acknowledged by Hall. As membrane roofing is thus not an all-encompassing term, there can be no serious contention that an exclusion of all membrane roofing — whether applied hot or cold — would somehow swallow coverage and thus require a judicially imposed limitation that is nowhere to be found in the policy, i.e., judicially restricting the exclusion of membrane roofing operations to those employing heat or fire and thereby not excluding insurance coverage for Hall's "cold" operation.

In summary, Hall's acknowledgment that it was engaged in commercial membrane roofing operations at the time of the incident in question coupled with our determination that nothing in the policy either defines membrane roofing or

restricts that term to include some but not all such operations , viz., heat but not cold, I cannot imagine what can come out on remand by way of expert testimony that could mystically require or even justify a court's limiting the exclusion of coverage of membrane roofing operations to those involving fire or heat in their installation.[1] My admittedly belabored point is that, however well-intentioned, our overly conscientious caution in remanding this case for further consideration of the meaning of membrane roofing within the construction and roofing industry will almost certainly prove to have been a hollow act.

---

[1] Hall's expert testified that he is a member of the Construction Specifications Institute (CSI) which, among other things, jointly (with Mc-Graw Hill) promulgates the so-called Sweets Catalog, specifically, the Master Format Reference Guide. That multi-volume set is universally recognized in the construction industry as an encyclopedic work, and a quick skimming of its index makes clear that there are numerous categories of commercial and industrial roofing operations, such as shingles and shakes, metal roof tile, slate shingles — and, yes, "Membrane Roofing" — to name but a few. Sweets further reflects that there are additional specialized roofing operations that employ "membranes" in the dictionary sense but are not deemed "membrane roofing" in the trade, such as tensioned fabric structures (like the Denver International Airport), greenhouses, swimming pool enclosures, and solariums.