TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-98-00226-CV






BancTec, Inc., Appellant



v.



Jesse Redman, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT


NO. 94-14529, HONORABLE JOSEPH HART, JUDGE PRESIDING 






 This is a breach of contract case. Appellee Jesse Redman sued appellant BancTec,
Inc. ("BancTec") for allegedly underpaying him for his part in closing a sales brokerage
agreement with Dell USA Corporation (the "Dell Agreement"). The jury found in Redman's
favor and awarded him $209,090.95 in damages. The trial court rendered judgment on the
verdict, and BancTec now appeals. We will affirm the trial court judgment. 


STATEMENT OF FACTS

 From 1988 through November 1993, Redman worked first in marketing, then in
sales, for BancTec Service Corporation ("BSC"), a wholly-owned subsidiary of BancTec. BSC's
business included selling service contracts to end-users of personal computers ("PCs") whereby
BSC agreed to provide maintenance to PCs, local area networks, and associated peripherals such
as telephone support, labor repair, and parts replacement. As a salesperson of these service
contracts, Redman earned a base salary and received commissions if he exceeded his annual sales
quota. The commissions Redman could earn were determined by reference to an annual
compensation plan. The annual compensation plan for fiscal year 1992 (the "Compensation Plan")
is the contract at issue in this case. (1)

 The 1992 Compensation Plan was in effect when the Dell USA Corporation
("Dell") contacted BSC about providing maintenance services to Dell customers. BSC saw this
as a good opportunity to expand its business and passed the lead to Redman, whose sales territory
covered Texas, where Dell's headquarters are located. Redman worked for approximately one
year to secure a contract with Dell, and he played a substantial role in negotiating the terms of the
Dell Agreement. 

 The Dell Agreement is titled "Service Contract Sales Brokerage Agreement," and
provides that Dell will inform its customers of the availability of BSC service contracts for Dell
PCs and will issue service contracts to purchasers of Dell PCs on BSC's behalf. Both Redman and
Bill Basset, who was president of BSC at the time the Dell Agreement was signed, testified that
BSC, in effect, provided the warranty services for Dell PCs. In other words, when Dell sold a
PC that included a one-year warranty, BSC was obligated to perform the warranty work on that
PC and Dell was obligated to pay BSC the amount specified in the Dell Agreement for the specific
type of warranty sold with the PC.

 BSC officers later determined that the Dell Agreement did not qualify for a
commission under the provisions of the Compensation Plan. Basset, BSC's president, informed
Redman by letter that the Dell Agreement instead would be treated "as a multi-year (3 years)
contract having a booking value of $2,500,000 for each of the years. This value will be applied
to your FY 1992 plan [the Compensation Plan] as an approved booking for commissions, bonus,
and Chairman's Club." With the letter, Basset included a check for the net amount of $97,897.88,
payable to Redman. Of this amount, $87,500 compensated Redman for his role in the Dell
Agreement, while the remainder compensated him for other sales. 

 Redman testified that he complained to his supervisor, Mike Burns, that $2,500,000 
per year was an improperly low value to assign to the Dell Agreement (2) and that even accepting
the improperly low yearly value, $87,500 was a miscalculation of the commission. Redman
explained that he raised the issue several times with Burns to no avail, and that although he
discussed his dissatisfaction with higher-management personnel, he never discussed his problem
with the president, Bill Basset. When Redman received notice from Jim Uren, the general
manager of BSC, that he would not receive additional commissions for the Dell Agreement, he
sued BancTec for fraud, quantum meruit, and breach of contract.

 The parties proceeded to a jury trial. At the close of Redman's evidence, BancTec
moved for a directed verdict on all of Redman's claims. The trial court directed a verdict against
Redman as to fraud and quantum meruit. At the close of all the evidence, BancTec again moved
for a directed verdict on the breach of contract claim but the court overruled the motion and
submitted the breach of contract claim to the jury. The jury determined that BancTec failed to
comply with Redman's Compensation Plan and awarded Redman $209,090.95 in damages. (3)
BancTec filed a motion for judgment notwithstanding the verdict; the trial court denied the motion
and rendered judgment on the verdict. BancTec filed a motion for new trial, which was also
overruled. 

 BancTec appeals the trial court judgment, arguing that the trial court erred: (1) by
denying BancTec's motion for directed verdict; (2) by admitting evidence of the ultimate
profitability of the Dell Agreement; and (3) by denying BancTec's motion for judgment
notwithstanding the verdict.


DISCUSSION

 BancTec complains in its first issue that the trial court erred by denying its motion
for a directed verdict on Redman's breach of contract claim. This issue contains three independent
arguments. First, BancTec contends that because the Compensation Plan is unambiguous, the trial
court erred by submitting the breach of contract claim to the jury. Second, BancTec argues that
there was no evidence that it breached the Compensation Plan. Finally, BancTec argues that BSC,
not BancTec, was Redman's employer; therefore, BancTec cannot be held liable for the alleged
breach. We will first review BancTec's claim that the Compensation Plan is unambiguous. 




BancTec's Claim That the Compensation Plan is Unambiguous

 Whether a contract is ambiguous is a question of law for the court to decide by
looking at the contract as a whole in light of the circumstances present at the time the contract was
executed. See National Union Fire Ins. Co. v. CBI Indus., 907 S.W.2d 517, 520 (Tex. 1995);
Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983). The primary concern of a court in construing
a written contract is to ascertain the true intent of the parties as expressed in the instrument. See
National Union, 907 S.W.2d at 520. If a written contract is worded so that it can be given a
definite or certain legal meaning, then it is not ambiguous. See id. Parol evidence is not
admissible for the purpose of creating an ambiguity. See id. If, however, the language of the
contract is uncertain or it is susceptible to two or more reasonable interpretations, it is ambiguous. 
See id.; Coker, 650 S.W.2d at 393. Only where a contract is first determined to be ambiguous
may the court consider the parties' interpretation and admit extraneous evidence to determine the
true meaning of the instrument. See National Union, 907 S.W.2d at 520.

 BancTec contends that the following provisions of the Compensation Plan are
unambiguous and therefore the trial court erred by not construing the Compensation Plan as a
matter of law.

 BASE COMMISSION RATE: A commission will be available for a firm
contract, for a customer not previously under
maintenance contract with BancTec, accepted
by an officer of BancTec Service Corp. A
firm order is defined in the BancTec Policy
and Procedure Manual. Commissions will
apply only for released products or services
listed in the Price List. The rate of payment
is as assigned.


 a. Commissions are calculated on the net
contract amount, less any discounts, for
assigned products or services. Sales of any
products or services not defined above will
not be included in the calculation.


 * * * 


 
b. Management reserves the right to make an
appropriate reduction in commissions and
bonuses for any approved or unapproved
deviation from standard pricing.


 * * * 


MULTI-YEAR CONTRACT: The commission, but not the quota credit, for
multi-year approved firm contracts, for
customer [sic] not previously under a
maintenance contract with BancTec, will be
calculated as follows:


 1 year - 100% contract value

 2 year - 150% contract value

 3 year - 175% contract value.


 The commission rate used for multi-year
contracts will be determined under the
section titled Commissions. The quota credit
for multi-year contracts will be determined
based upon the first year contract value, and
will not be included in subsequent year
quota.


 QUOTA BONUS: Commissions will be available for 1.5 times
the normal rate of payment for all firm
orders above the assigned annual quota. 


 * * * 


EXCEPTIONS: Any situations not specifically covered herein
and any deviations from the standard prices
and/or configurations for sales made and the
related commissions or bonuses will be
solved by the President. 


 * * *


 DURATION: This entire plan is subject to change at any
time at the sole discretion of BancTec Service
Corp. 


 According to the contract terms recited above, the sale of a service contract had to
meet specific criteria in order to qualify for a commission under the Base Commission Rate. The
service contract had to be: (1) a firm contract; (2) for a customer not previously under a
maintenance contract with BancTec; (3) accepted by an officer of BSC; (4) for the sale of released
products or services listed in the Price List. (4) Paragraph (c) of the Base Commission Rate provides
that management could make "an appropriate reduction in commissions and bonuses" for any
deviation from standard pricing. The "Exceptions" provision explains that commissions or
bonuses for service contracts that deviated from standard pricing or that were not covered by the
other provisions of the Compensation Plan would be "solved by the President." 

 In his letter to Redman, Basset explained that the Dell Agreement "is an agreement
to do business in the future and does not result in a firm contract as required in your compensation
plan." BancTec contends that because the Dell Agreement did not meet the unambiguous criteria
of the Base Commission Rate, Redman was not entitled to a commission for the Dell Agreement. 
BancTec reasons that because Basset exercised his discretion in favor of paying Redman a
commission even though Redman was not contractually entitled to a commission at all, BSC did
not breach the Compensation Plan as a matter of law. 

 Redman contends that material terms in the Compensation Plan are ambiguous;
therefore, it was up to the jury to determine whether the Dell Agreement fell within the contract's
Base Commission Rate provisions or the Exceptions provision. Even if the Dell Agreement fit
within the Exceptions provision, as BancTec contends, Redman argues that it was still up to the
jury to determine whether BSC breached the Compensation Plan. Redman asserts first that part
(c) of the Base Commission Rate, which provides the management discretion to make
"appropriate" reductions in the amount of the commission for deviations from standard pricing,
must be construed with the Exceptions paragraph, which also relates to commissions for contracts
deviating from standard pricing. He argues that the term "appropriate" is inherently ambiguous
and therefore it was up to the jury to determine whether valuing the Dell Agreement at 2.5 million
dollars per year was an "appropriate" reduction for the Dell Agreement's deviation from standard
pricing. Redman also argues that the jury could find that BancTec breached his Compensation
Plan because the "Multi-Year Contract" provision requires BSC to pay Redman a commission
based on the three-year net value of the Dell Agreement assigned by Basset, 7.5 million dollars;
BSC paid Redman a commission based on only the one-year assigned value of 2.5 million dollars.



Base Commission Rate Provisions

 The preliminary dispute between the parties concerns the interpretation of the Base
Commission Rate terms "firm contract" and "customer," the use of the Price List in selling
service contracts, and the statement that commissions are calculated on the "net contract amount." (5)
 BancTec insists that the Dell Agreement was not a "firm contract," that Dell was not a
"customer," that the Dell Agreement was not "for released products or services listed in the Price
List," and that the Dell Agreement did not have a "net contract" value. 

 The term "firm contract" is not defined by the Commission Plan, and the
Compensation Plan does not provide a reference for a definition. BancTec argues that "firm
contract" means a contract that is a sales order, with a net contract value, for released services
from the Price List, that does not deviate from standard prices. BancTec's definition incorporates
several of the elements of the Base Commission Rate; however, the contract itself does not make
clear that "firm contract" is a broad term encompassing the other requirements. Redman argues
that because the Dell Agreement was an agreement to do business and was signed and accepted
by Dell and BSC officers, it was a "firm contract." Because the meaning of the term is not
specified in the Compensation Plan, we believe both parties' interpretations are reasonable. 
Accordingly, we hold that term "firm contract," as used in the Compensation Plan, is susceptible
to more than one reasonable meaning. 

 BancTec also argues that Dell was not a "customer," because the Dell Agreement
defined "customers" as the ultimate consumers of BSC's services; that is, the owners and lessees
of Dell PCs. BancTec's argument is misplaced. We are called upon to interpret the provisions
of the Compensation Plan, not the Dell Agreement. The Compensation Plan does not define
"customer." BancTec contends that its "customers" are the individuals who purchase the service
agreements--PC end-users--and that Dell is the broker between BancTec and Dell end-users, not
BancTec's customer. Redman points out that the plain meaning of "customer" encompasses one
with whom a business has regular dealings. See Black's Law Dictionary 386 (6th ed. 1992);
Webster's Third New Int'l Dictionary 559 (Phillip B. Gove ed., 1986). We believe "customer,"
like "firm contract," is subject to more than one reasonable interpretation as the term is used in
the Compensation Plan. Accordingly, it was up to the trier of fact to determine whether the Dell
Agreement was a "firm contract" and whether Dell was a "customer" under the terms of the
Compensation Plan.

 BancTec argues next that the Dell Agreement was not "for released products or
services listed in the Price List" because warranty work is not listed in the Price List. The "Price
List" refers to a document containing specific prices for each type of maintenance service available
to BSC's customers. The Price List includes maintenance service for a variety of equipment,
including individual workstations as well as file servers and networks. The Dell Agreement
required Dell to pay BSC a specified amount for each service contract Dell sold on BSC's behalf;
the amount varied depending on whether the service contract covered an individual workstation,
file server, or network, among other things. Dell was free to charge its customers any price it
chose for BSC's service contracts so long as Dell paid BSC the amount required by the Dell
Agreement. While Dell did not purchase services listed in the Price List, it agreed to sell services
comparable to those listed in the Price List to its customers on BSC's behalf, (6) and to then pay BSC
the amount specified in the Dell Agreement for the service. BancTec argues that the provision in
question requires a sale of standard services at the listed prices. This requirement, however, is
not unambiguously stated in the Compensation Plan, which provides: "Commissions will apply
only for released products or services listed in the Price List." The Dell Agreement covered the
type of services that BSC historically provided its customers and required BSC to provide those
services to Dell PCs covered by warranties issued during the effective dates of the Dell
Agreement. Therefore, whether the Dell Agreement was "for released products or services listed
in the Price List" is a question of fact.

 Both Redman and BancTec spend the bulk of their efforts addressing whether the
Dell Agreement was "for released products or services listed in the Price List," arguing about the
effect of the Dell Agreement's deviation from standard pricing as listed in the Price List. This
argument presumably is based on BancTec's contention that the provision requires service
contracts to reflect the prices listed in the Price List. As we have noted, this provision does not
state that standard pricing is a prerequisite to a commission. 

 The term "standard pricing" first appears in part (c) of the Base Commission Rate,
which grants the management discretion to make "appropriate" reductions in the amount of the
commission for "any approved or unapproved deviation from standard pricing." It appears from
this provision that standard pricing is relevant to the amount of the commission, not to the
availability of a commission. The Exceptions provision, incorporated toward the end of the
Compensation Plan, states that commissions for contracts deviating from standard pricing "will
be solved by the President." Thus, the Compensation Plan states in one instance that deviations
from standard pricing will result in an appropriate reduction in commissions while in another that
the commissions for contracts deviating from standard prices "will be solved by the President." 
These two separate references to standard pricing create an ambiguity as to the proper treatment
of contracts deviating from standard pricing; therefore, it was up to the trier of fact to determine
the effect of the Dell Agreement's deviation from standard pricing. 

 Finally, BancTec argues that the Dell Agreement did not result in a net contract
amount. Part (a) of the Base Commission Rate states: "Commissions are calculated on the net
contract amount . . . ." The Compensation Plan does not explain how to determine whether a
contract has a net contract amount. BancTec explained that the net contract amount was ordinarily
calculated by multiplying the price of the services by the quantity of services sold, and that the net
contract value was the revenue BancTec knew it would receive from the contract at the time the
contract was executed. It is equally plausible, however, that a net contract amount could be
assigned by management or based on a percentage of the price of the services because the term
"net contract amount," as it is used in the Compensation Plan, does not have a definite or certain
legal meaning. Furthermore, we believe the ambiguities we have already discussed render
ambiguous all of the Base Commission Rate provisions relevant to the availability and amount of
a commission. Therefore, we hold that whether the Dell Agreement was covered by the
Compensation Plan's Base Commission Rate was a question for the jury. 


Exceptions Provision

 BancTec contends that the Dell Agreement did not fall within the Base Commission
Rate but instead was covered by the unambiguous language in the Exceptions provision. 
According to BancTec, the Exceptions provision gave BSC's president complete discretion
whether to award Redman a commission for the Dell Agreement. Because BSC awarded Redman
a commission for the Dell Agreement, BancTec contends that it did not breach the Compensation
Plan as a matter of law and the trial court erred by submitting the issue to the jury.

 Redman replies that even if his commission for the Dell Agreement fell within the
Exceptions provision, whether BSC breached his Compensation Plan was still a question for the
jury. First, he contends that the Exceptions paragraph, which permits the President to "solve"
commissions for contracts that deviate from standard pricing or that are not otherwise covered by
the Compensation Plan, must be read with part (c) of the Base Commission Rate, which requires
that any reduction in a salesperson's commission for deviating from standard pricing be
"appropriate." He argues that the term "appropriate" is inherently ambiguous and therefore it was
up to the jury to determine whether valuing the Dell Agreement at $2,500,000 per year was an
"appropriate" reduction for the Dell Agreement's deviation from standard pricing. 

 We agree that the two provisions should be read together because both address
contracts that deviate from standard pricing, and we have already held that the separate references
to standard pricing create an ambiguity as to the proper treatment of contracts deviating from
standard pricing. Therefore, it was up to the trier of fact to determine the effect of the Dell
Agreement's deviation from standard pricing. 

 Redman also argues that even if the jury determined that valuing the Dell
Agreement at 2.5 million dollars per year was appropriate, as BancTec contends, there is still
evidence of a breach because Basset's letter to him stated that the Dell Agreement would be treated
"as a multi-year (3 years) contract having a booking value of $2,500,000 for each of the years. 
This value will be applied to your FY 1992 plan as an approved booking for commissions, bonus,
and Chairman's Club." (Emphasis added.) Redman contends that the commission he received
for the Dell Agreement is less than the amount to which he was entitled if the value assigned by
Basset is applied to the "Multi-Year Contract" provision of the Compensation Plan. 

 The "Multi-Year Contract" provision states that for a three-year contract, the
salesperson's commission will be calculated using 175% of the contract value. "Contract value"
is not defined. BancTec argues that "contract value" means the one-year value of the contract
while Redman argues that "contract value" means the full three-year value. The second part of
the Multi-Year Contract provision states that the "quota credit for multi-year contracts will be
determined based upon the first year contract value." (Emphasis added.) While it is reasonable
to believe that, like the quota credit, the commission is determined based on the first year contract
value, it is also reasonable to believe that because the language in the Compensation Plan does not
limit the commission to the first year value, the commission is calculated based on the total value
of the contract. Because there is more than one reasonable interpretation for "contract value" as
it is used in the Multi-Year Contract provision, the term is ambiguous. Accordingly, we agree
with Redman that even if the Dell Agreement fell within the Exceptions provision, it was up to
the trier of fact to determine whether BSC breached the Compensation Plan. 


Duration Provision

 BancTec makes one final argument. It points out that regardless of any other
provision, the Compensation Plan gave BSC complete discretion to deny a commission for the Dell
Agreement through the "Duration" provision, which states: "This entire plan is subject to change
at any time at the sole discretion of BancTec Service Corp." We disagree. The provision is
entitled "Duration," indicating that the substance of the provision addresses the time period
covered by the Compensation Plan as written, the period during which it is in effect, not the
availability of a commission. The Duration provision permits BSC to change the Compensation
Plan at any time, but the change would control future transactions. The record does not suggest
that BSC changed the Compensation Plan during the fiscal year at issue, and the subject plan was
in effect when the Dell Agreement was signed. In effect, BancTec's position seems to be that BSC
could unilaterally alter the Compensation Plan and make its decision retroactive such that every
commission payment is made in its sole discretion. The Duration provision does not make clear
an intent to render discretionary every commission award. If it were intended to make all
commissions discretionary, there would be no need for provisions such as part (c) of the Base
Commission Rate, which explains that commissions may be reduced in certain circumstances. 
Contracts should not be interpreted in such a way that renders a provision meaningless. See
Stinger v. Stewart & Stevenson Servs., Inc., 830 S.W.2d 715, 719 (Tex. App.--Houston [14th
Dist.] 1992, writ denied). Furthermore, if the Duration provision is intended to make all
commissions discretionary, then it is ambiguous because it conflicts with part (b) of the Base
Commission Rate, which affirmatively directs: "Commissions will be calculated and paid
monthly." (Emphasis added.) Because material provisions in the Compensation Plan are
ambiguous, we hold that the trial court did not err by submitting Redman's breach of contract
claim to the jury. 


BancTec's Legal Sufficiency Claim

 At the close of Redman's evidence, and again at the close of its evidence, BancTec
moved for directed verdict on the basis that there was no evidence to support a finding that
BancTec breached the Compensation Plan. Although BancTec also raised its legal sufficiency
challenge to the jury's finding of breach in its motion for judgment notwithstanding the verdict and
its motion for new trial, it directs its legal sufficiency complaint on appeal only to the trial court's
denial of its motion for directed verdict. 

 A directed verdict is proper when the evidence offered on a cause of action is
insufficient to raise an issue of fact. See Harris County v. Smoker, 934 S.W.2d 714, 722 (Tex.
App.--Houston [1st Dist.] 1996, writ denied). We review the denial of a directed verdict by
considering all the evidence in the light most favorable to the nonmovant, disregarding all
evidence to the contrary, and resolving all reasonable inferences in favor of the nonmovant. See
Russell v. City of Bryan, 919 S.W.2d 698, 705 (Tex. App.--Houston [14th Dist.] 1996, writ
denied); cf. Quantel Business Sys., Inc. v. Custom Controls Co., 761 S.W.2d 302, 303-04 (Tex.
1988) (standard when directed verdict is granted). 

 Based on this standard, we hold the evidence is legally sufficient to support the
verdict. Redman testified that he believed a "firm contract" was an agreement to do business
signed by the parties to the agreement. George Christian, BSC's vice president and author of the
Compensation Plan, testified in his deposition, which Redman used to cross-examine Christian,
that no contract had ever been accepted by BSC that was not a firm contract. Basset testified that
the amount Dell was required to pay BSC for each service contract it sold was listed in the Dell
Agreement, and that Dell "bundled" BSC's service contracts with the sale of Dell PCs and then
paid BSC for the service contracts.

 Redman testified that he believed Dell to be a customer because BSC had discussed
with him its marketing strategy of securing a large account like Dell. The evidence established
that there were substantial business dealings between Dell and BSC and that Dell paid BSC on a
regular basis for providing warranty services to Dell PCs. The testimony presented by both
parties established that the warranty services BSC provided to Dell as a result of the Dell
Agreement were similar to the maintenance services listed in the Price List that BSC normally
provided its direct customers. Both parties presented testimony that most service contracts
deviated from standard pricing.

 Redman explained to the jury that he believed that a value could be assigned to the
Dell Agreement based on the revenue from Dell's previous service provider, Xerox. Redman
testified that Xerox provided individual workstation maintenance services to Dell customers;
Basset testified that Xerox received approximately two million dollars in revenue from the services
Xerox provided Dell. The Dell Agreement provided that BSC would furnish warranty services
to Dell exclusively so long as BSC received revenues of at least 2.5 million dollars a year for those
warranty services. Redman also explained his belief that valuing the Dell Agreement at 2.5
million dollars a year was not an "appropriate" reduction for the Dell Agreement's deviation from
standard pricing. Redman testified that Xerox provided maintenance service only for individual
workstations, while the Dell Agreement required BSC to provide maintenance service for file
servers and networks, in addition to individual workstations, and BSC charged Dell higher prices
than Xerox charged. 

 Redman contended that even accepting the 2.5 million dollars per year value
assigned, BancTec nevertheless breached his Compensation Plan. The evidence to support this
theory stems from Basset's testimony. Basset determined that for booking purposes, the Dell
Agreement was a three-year contract with a value of 2.5 million dollars per year. Basset testified
that once he gave the Dell Agreement a value, Redman's commission was "computed just as we
would compute any contract with a booking value." Accordingly, the Multi-Year Contract
provision of the Compensation Plan was applied. The Multi-Year Contract provision states that
the multiplier for three-year contracts is 175% of the contract value. The question Redman raised
with regard to this provision was whether "contract value" meant the value for the first year or
the value for all three years added together. He testified that he believed all three years should
be added together. The jury also had before it the Compensation Plan, which stated that the quota
credit would be determined based on the first year contract value, with no similar provision
regarding the commission. Redman explained that his commission rate was 2% and he explained
how that rate was applied to sales. (7)

 There is no way to determine whether the jury believed the Dell Agreement fit
within the Base Commission Rate, whether the jury thought that Basset did not appropriately
reduce the value of the Dell Agreement, or whether the jury felt that Redman should have been
paid for the three-year value of the contract rather than the one-year value of the contract. The
jury was simply asked, "Did BancTec, Inc. fail to comply with Jesse Redman's fiscal year 1992
compensation plan?" (8) We believe the jury had before it some evidence to answer that question
affirmatively. Therefore, BancTec's challenge to the legal sufficiency of the evidence is
overruled.


BancTec's Claim That it is not the Proper Party

 In BancTec's verified answer, it asserted that BancTec had been wrongly named
as the defendant because BSC, not BancTec, employed Redman at all times material to his claims. 
BancTec argues that the trial court erred by denying its motion for directed verdict on this ground;
however, BancTec did not assert that it had been wrongly named when it moved for directed
verdict on Redman's claims. Although BancTec's pretrial motion for summary judgment on this
point had been denied, BancTec never urged that it was an improper party either time it moved
for directed verdict. Neither did BancTec bring this issue to the trial court's attention during the
charge conference, in its motion for judgment notwithstanding the verdict, or in its motion for new
trial. Accordingly, the trial court cannot have erred by denying a motion for directed verdict on
a ground not asserted in the motion. Having ruled against BancTec on all the points raised in its
first issue, we overrule that issue.


BancTec's Evidentiary Claim

 In its second issue, BancTec contends that the trial court erred by admitting
evidence of the ultimate profitability of the Dell Agreement because the document containing the
figures was not relevant and constituted inadmissible hearsay. The admission or exclusion of
evidence is committed to the trial court's sound discretion. See City of Brownsville v. Alvarado,
897 S.W.2d 750, 753 (Tex. 1995). A party seeking to reverse a judgment based on the admission
or exclusion of evidence must show that the evidence was erroneously admitted or excluded and
that the error probably caused the rendition of an improper judgment. See id.; see also Tex. R.
App. P. 44.1(a)(1). A successful challenge to evidentiary rulings usually requires the complaining
party to show the judgment turns on the particular evidence excluded or admitted. See Alvarado,
897 S.W.2d at 753-54. If error was committed in this case, we must then examine the entire
record to determine if the judgment was controlled by the evidence that should have been
excluded. See Gee v. Liberty Mut. Fire. Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989). 

 Assuming without deciding that it was error to admit the document, we hold that
the admission did not cause appellant harm. The Dell Revenue document shows that the first year
the Dell Agreement was in effect, it generated over six million dollars for BSC, the second year
it generated over twelve million dollars, and the third year it generated over fifteen million dollars,
resulting in a total of more than thirty-four million dollars in revenue. Based on these figures,
Redman requested the jury to award him $1,719,070 additional commissions for the Dell
Agreement. Instead, the jury awarded Redman only $209,090.95, an amount that, when added
to the commission Redman already received, is close to what Redman would have initially
received had BSC awarded him a commission on the three-year assigned value of the Dell
Agreement, 7.5 million dollars, rather than the one-year value, 2.5 million dollars. We have
already held that construing the Multi-Year Contract provision of the Compensation Plan as
requiring the commission to be calculated based on the full three-year value of the contract is one
reasonable interpretation of that provision of the Compensation Plan. Accordingly, we do not
believe that the judgment turns on the challenged document. The error, if any, does not require
reversal. BancTec's second issue is overruled.


BancTec's Motion for Judgment Notwithstanding the Verdict

 In its third issue, BancTec complains that the trial court erred by denying its motion
for judgment notwithstanding the verdict on the basis that the evidence is not factually sufficient
to support the jury's verdict finding breach or damages. BancTec urged in its motion for judgment
notwithstanding the verdict only that the evidence was factually insufficient to support the finding
of breach; it did not urge the factual insufficiency of the evidence to support the damage award. 
Therefore, error cannot rest on the latter basis. Regardless of the grounds stated in the motion,
a motion for judgment notwithstanding the verdict preserves only a presented claim of legal
insufficiency, not factual insufficiency. See Tex. R. Civ. P. 301; Kratz v. Exxon Corp., 890
S.W.2d 899, 902 (Tex. App.--El Paso 1994, no writ); Brazosport Bank v. Oak Park Townhouses,

889 S.W.2d 676, 682 (Tex. App.--Houston [14th Dist.] 1994, writ denied) (on remand). Factual
insufficiency points must be preserved by a motion for new trial. See Tex. R. Civ. P. 324(b)(2);
Cecil v. Smith, 804 S.W.2d 509, 510-11 (Tex. 1991). Therefore, neither factual sufficiency
complaint was preserved by BancTec's motion for judgment notwithstanding the verdict, and the
trial court did not err by denying the motion on this basis.

 BancTec did file a motion for new trial in which it argued that the jury's damage
award was not supported by factually sufficient evidence. The trial court denied BancTec's motion
for new trial, but BancTec has not appealed the trial court's denial of that motion. Therefore,
although BancTec preserved the factual sufficiency issue with regard to the damages awarded, it
has not presented a proper issue for this Court to review. In any event, we have reviewed the
record carefully and we believe the jury was presented with sharply conflicting evidence regarding
the proper interpretation of the Compensation Plan. And, as we have explained above, the jury
had before it sufficient evidence to support its award of damages. Accordingly, BancTec's third
issue is overruled. 





CONCLUSION

 Having overruled BancTec's three issues, we affirm the judgment of the trial court. 



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices Kidd and Powers*

Affirmed

Filed: May 20, 1999

Do Not Publish





















* Before John E. Powers, Senior Justice, (retired), Third Court of Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. Fiscal year 1992 ran from April 1, 1991 through March 30, 1992.
2. Redman contends that BSC improperly used the one-year value of the Dell Agreement,
$2,500,000, to calculate his commission. The proper value to assign the Dell Agreement,
according to Redman, was the three-year value of $7,500,000 because Basset's letter stated that
the Dell Agreement would be treated "as a multi-year (3 years) contract having a booking value
of $2,500,000 for each of the years." (Emphasis added.)
3. The jury was not asked to determine the meaning of specific contract terms. It was asked
only, "Did BancTec, Inc. fail to comply with Jesse Redman's fiscal year 1992 compensation
plan?"
4. Though BancTec argues that the Base Commission Rate requires the contract to be a "firm
order" as "defined in the BancTec Policy and Procedure Manual," no provisions in the
Compensation Plan hinge the availability of a commission on the requirement that a service
contract be a firm order. Although the "Quota Bonus" provision states that commissions will be
calculated at "1.5 times the normal rate of payment" for firm orders above the assigned annual
quota, this provision does not make clear that "firm order" and "firm contract" have the same
meaning. Instead, the Quota Bonus provision creates an ambiguity as to whether "firm order" is
different from or synonymous with "firm contract."
5. The parties do not dispute that the Dell Agreement was "accepted by an officer of BSC" and
that Dell "was not previously under [a] maintenance contract with BancTec." 
6. The Dell Agreement states: "Dell shall render sales and marketing assistance [to BancTec]
for the sale of Service Contracts in the United States . . . ." (Emphasis added.)
7. For simplicity, Redman's formula would appear as 7,500,000 x 2% x 175% = $262,000,
while the calculation BancTec used is: 2,500,000 x 2% x 175% = $87,500. These calculations
are imprecise because other variables not relevant to the explanation of Redman's argument, such
as bonus percentages, bear on the exact commission calculation.
8. As we will explain in the next section of this opinion, although merely conjecture, it appears
from the damage award that the jury chose the third alternative.



rt denied BancTec's motion
for new trial, but BancTec has not appealed the trial court's denial of that motion. Therefore,
although BancTec preserved the factual sufficiency issue with regard to the damages awarded, it
has not presented a proper issue for this Court to review. In any event, we have reviewed the
record carefully and we believe the jury was presented with sharply conflicting evidence regarding
the proper interpretation of the Compensation Plan. And, as we have explained above, the jury
had before it sufficient evidence to support its award of damages. Accordingly, BancTec's third
issue is overruled. 





CONCLUSION

 Having overruled BancTec's three issues, we affirm the judgment of the trial court. 



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices Kidd and Powers*

Affirmed

Filed: May 20, 1999

Do Not Publish