TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-01-00498-CV






CU Lloyd's of Texas and Potomac Insurance Company of Illinois, Appellants



v.



Main Street Homes, Inc. and Main Street, Ltd., Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT


NO. GN102640, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING







 This appeal arises from a dispute over insurance coverage between appellees Main
Street Homes, Inc. and Main Street, Ltd. (together "Main Street"), and appellants CU Lloyd's of
Texas and Potomac Insurance Company of Illinois (together "Lloyds"). Lloyds, Main Street's
insurance provider, refused Main Street's request to defend Main Street in two suits brought against
it. Following Lloyds' refusal, Main Street sued Lloyds, seeking, inter alia, a declaratory judgment
that Lloyds had a duty to defend Main Street. (1) Main Street moved for partial summary judgment that
its insurance policies contractually obligated Lloyds to defend it in the underlying suits. Lloyds also
moved for partial summary judgment, arguing that there was no duty to defend because the
underlying suits' pleadings did not allege an "occurrence" and, alternatively, that the policies'
business-risk exclusions applied. The district court granted Main Street's motion and denied
Lloyds'. The court then granted an agreed motion to sever, rendering the duty-to-defend issue
appealable. Lloyds appeals the district court's grant of summary judgment in favor of Main Street
and the denial of its own motion. We will affirm the district court's judgment.


FACTUAL AND PROCEDURAL BACKGROUND


 Main Street, a general contractor, constructed residential homes in two subdivisions,
Chimney Hills North in Austin and Ashford Park in Buda. At Chimney Hills, Main Street hired
Professional Design Group ("PDG") to design foundations for the homes. Kevin and Denise
Holiday purchased one of the homes, and subsequently observed structural defects in the home's
construction. The Holidays filed suit against Main Street as a result of alleged foundation defects. (2) 
The Holiday petition asserts that Main Street received warnings that the foundations of the Chimney
Hills homes, as designed, were inappropriate for the subdivision's soil conditions, and that Main
Street disregarded the warnings and knowingly proceeded with construction. The Holidays seek
damages for violations of the Texas Deceptive Trade Practices Act, fraud, breach of implied
warranty, negligence, and fraudulent conveyance.

 At Ashford Park, Main Street subcontracted with PDG and another foundation
engineering firm (3) for the design and construction of residential foundations. Several Ashford Park
homeowners brought a suit similar to the Holidays', (4) alleging that Main Street and PDG relied on
an inaccurate soil survey, which resulted in deficient foundation designs that they knew were
destined to fail. The Armstrong petition does not seek damages from Main Street for negligence,
but does assert that the foundations' conditions are construction defects and structural failures as
defined by the Texas Residential Construction Liability Act. See Tex. Prop. Code Ann. § 27.001(2),
(5) (West 2000).

 Lloyds was Main Street's insurance carrier from September 1998 to September 2000,
the period in which the Holiday and Armstrong causes of action arose. During this time, Main Street
was covered by two identically worded comprehensive general liability insurance policies (the
"policies"). (5) "Coverage A," the applicable portion of the policies, insured Main Street for "bodily
injury" and "property damage" and provided that Lloyds would defend Main Street from suits
brought against it. (6) Upon learning of the Holiday and Armstrong petitions, Main Street notified
Lloyds, requesting that it provide a defense to the suits. Lloyds declined on the basis that the
petitions failed to allege claims covered by the policies. Main Street then brought this suit.

 Main Street moved for partial summary judgment on the grounds that the pleadings
in the underlying petitions contained allegations of covered occurrences and allegations falling
within the "products-completed operations hazard" clause of the policies. (7) Lloyds also moved for
partial summary judgment, asserting that the policies did not require it to defend because the facts
alleged in the underlying pleadings do not allege an "occurrence," and, in the alternative, that the
policies' "business risk" exclusions negated coverage for faulty workmanship, thereby failing to
trigger a duty to defend. The district court rendered partial summary judgment, granting Main
Street's motion and denying Lloyds'. In the summary judgment, the district court found that Lloyds
had a duty to defend Main Street, which it breached, and that Lloyds was obligated to reimburse
Main Street for its defense costs. The parties then jointly moved to sever, requesting that these
issues be made final and appealable. The district court granted the motion, and Lloyds brings this
appeal.


DISCUSSION


 When both sides move for summary judgment and the trial court grants one motion
and denies the other, the appealing party may appeal both the prevailing party's motion as well as
the denial of its own. Holmes v. Morales, 924 S.W.2d 920, 922 (Tex. 1996). In such a situation, we
review the summary-judgment evidence presented by both sides and determine the questions
presented. Commissioners Court v. Agan, 940 S.W.2d 77, 81 (Tex. 1997). If the pertinent facts are
undisputed, we can determine the issues presented as a matter of law. Devoe v. Great Am. Ins., 50
S.W.3d 567, 570 (Tex. App.--Austin 2001, no pet.). This Court may then either affirm or reverse
and render. Jones v. Strauss, 745 S.W.2d 898, 900 (Tex. 1988); Tobin v. Garcia, 316 S.W.2d 396,
400-01 (Tex. 1958). However, if resolution of the issues rests on disputed facts, summary judgment
is inappropriate, and we will reverse and remand. Coker v. Coker, 650 S.W.2d 391, 394-95 (Tex.
1983). The parties do not dispute the pertinent facts; the issue in this case is whether those facts
trigger Lloyds' duty to defend.

 To determine an insurer's duty to defend, Texas courts follow the "eight corners"
rule. See National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc., 939 S.W.2d 139, 141
(Tex. 1997); Texas Prop. & Cas. Ins. Guar. Ass'n v. Southwest Aggregates, Inc., 982 S.W.2d 600,
604 (Tex. App.--Austin 1998, no pet.) (citing American Alliance Ins. Co. v. Frito-Lay, Inc., 788
S.W.2d 152, 153-54 (Tex. App.--Dallas 1990, writ dism'd)). Pursuant to the rule, we consider only
the allegations in the underlying complaint and the terms of the insurance policy to determine
whether a duty to defend exists, giving the allegations in the petition a liberal interpretation and
resolving any doubt in favor of the insured. McCarthy Bros. Co. v. Continental Lloyds Ins. Co., 7
S.W.3d 725, 728 (Tex. App.--Austin 1999, no pet.) (citing Merchants Fast Motor Lines, 939
S.W.2d at 141). "The duty to defend is not affected by the facts of the case ascertained before,
during, or after the suit." Cullen/Frost Bank of Dallas, N.A. v. Commonwealth Lloyd's Ins. Co., 852
S.W.2d 252, 255 (Tex. App.--Dallas 1993, writ denied). Nor do we consider the reliability of the
allegations in the underlying pleadings. Id. If the underlying petition does not allege facts within
the scope of coverage, the insurer has no duty to defend. Id. Once coverage has been found for any
portion of a suit, an insurer must defend the entire suit. St. Paul Ins. Co. v. Texas Dep't of Transp.,
999 S.W.2d 881, 884 (Tex. App.--Austin 1999, pet. denied). Therefore, to determine whether
Lloyds has a duty to defend Main Street, we consider only the allegations in the underlying petitions
and the provisions of the insurance policies.


A. Occurrence

 The applicable portion of the policies is Section I, Coverage A, which states:


1. Insuring Agreement


 a. We will pay those sums that the insured becomes legally obligated to pay
as damages because of "bodily injury" or "property damage" to which this
insurance applies. We will have the right and duty to defend any "suit"
seeking those damages . . . .


 b. This insurance applies to "bodily injury" and "property damage" only if:


 (1) The "bodily injury" or "property damage" is caused by an
"occurrence" that takes place in the "coverage territory"; and


 (2) The "bodily injury" or "property damage" occurs during the policy
period.



The policies define "occurrence" as "an accident, including continuous or repeated exposure to
substantially the same general harmful conditions." However, the policies do not define "accident."

 "Accident," in the context of a general liability insurance policy, "include[s] negligent
acts of the insured causing damage which is undesigned and unexpected." Massachusetts Bonding
& Ins. Co. v. Orkin Exterminating Co., 416 S.W.2d 396, 400 (Tex. 1967). However, when the action
taken is an intentional tort, there is no accident, regardless of whether the results are unintended or
unexpected. See Argonaut Southwest Ins. Co. v. Maupin, 500 S.W.2d 633, 635 (Tex. 1973). In
Trinity Universal Insurance Co. v. Cowan, the court held that the unauthorized, purposeful copying
of revealing personal photographs to show others was intentional, and therefore no accident, 945
S.W.2d 819, 827-828 (Tex. 1997), but reaffirmed that the definition of "accident" included "the
negligent acts of the insured causing damage which is undesigned and unexpected." Id. at 828
(quoting Orkin, 416 S.W.2d at 400).

 Recently, the court again addressed "accident" in an insurance-coverage context and
stated that,


an injury is accidental "if from the viewpoint of the insured [it is] not the natural and
probable consequence of the action or occurrence which produced the injury; or in
other words, if the injury could not reasonably be anticipated by the insured, or would 

not ordinarily follow from the action or occurrence which caused the injury."



Mid-Century Ins. Co. v. Lindsey, 997 S.W.2d 153, 155 (Tex. 1999) (quoting Republic Nat'l Life Ins
Co. v. Heyward, 536 S.W.2d 549, 557 (Tex. 1976)) (alteration in original). The Lindsey court
observed that "both the actor's intent and the reasonably foreseeable effect of his conduct bear on
the determinations of whether an occurrence is accidental." Lindsey, 997 S.W.2d at 155. 
Furthermore, this Court has noted that the failure of a petition to include the word "accident" does
not preclude the possibility that an accident caused the damage. Stumph v. Dallas Fire Ins. Co., 34
S.W.3d 722, 729 (Tex. App.--Austin 2000, no pet.).

 Thus, if the tortfeasor's acts are deemed intentionally harmful, there is no accident,
therefore no occurrence, no duty to defend, and no policy coverage. However, if intentionally
performed acts are not intended to cause harm but do so because of negligent performance, a duty
to defend arises. See Federated Mut. Ins. Co. v. Grapevine Excavation, Inc., 197 F.3d 720, 729 (5th
Cir. 1999).

 Simply put, Lloyds' assertions are that the underlying petitions allege intentional
conduct by Main Street, and thereby, because of the eight-corners rule, deprive Main Street of
insurance coverage. 

 The Holiday petition alleges that both a construction superintendent and Main Street's
concrete contractor informed Main Street, before construction of the Chimney Hills homes, that the
foundation designs "were totally inappropriate" for the soil conditions. The construction
superintendent had the soil tested, revealing a higher plasticity index (8) than the designs anticipated. 
The petition contends that despite Main Street's knowledge of these test results, it constructed the
homes pursuant to the original PDG post-tension slab design, and neither disclosed the warnings nor
the results of the soil test to the homebuyers. "[T]he post tension slabs designed by . . . PDG were
not sturdy and/or stiff enough to resist the differential movement of the expansive clay soils in the
area," and "the residence was not designed nor built in a good and workmanlike fashion . . . ."

 We need not determine whether the Holiday petition alleges an intentional tort as the
petition's allegations against Main Street include allegations of negligence. See Grapevine
Excavation, 197 F.3d at 730. Because at least one of the claims asserted in the Holiday petition
potentially falls within the scope of coverage, Lloyds' duty to defend is triggered. Id. at 726; St. Paul
Ins. Co., 999 S.W.2d at 884.

 The Armstrong petition alleges that PDG designed the Ashford Park foundations in
accordance with a geotechnical investigation identifying the soil's maximum plasticity index as 32. 
However, a post-construction investigation revealed a significantly higher plasticity index. 
Additionally, the Armstrong plaintiffs contend Main Street "was aware, prior to the construction of
the foundations . . . that the slabs as designed would be inadequate," and that Main Street failed to
disclose this to the homebuyers. This knowledge is undisputed, the assertions continue, because
some Main Street foundations at Chimney Hills had failed, and Main Street had previously filed suits
against PDG for "inadequate foundation designs."

 The Armstrong petition does not preclude coverage. The petition fails to allege facts
that Main Street intentionally designed the foundations to fail. Conversely, the petition alleges that
Main Street built the foundations at Ashford Park in reliance on a geotechnical survey of the area
that Main Street received when it purchased the lots. Additionally, Main Street's second survey,
showing a higher plasticity index, was conducted after the homes had been built in reliance on the
earlier report. These allegations do not preclude damages due to an "accident," and therefore an
"occurrence," rather than a result of an intent to construct defective foundations.

 When construed liberally in favor of the insured, (9) the entirety of the pleadings'
allegations, particularly those relating to Main Street's potential liability for violations of the Texas
Deceptive Trade Practices Act and the Texas Residential Construction Liability Act, does not restrict
the Armstrong plaintiffs' to successfully prosecuting their suit only if they prove an intentional tort
on Main Street's part.

 Lloyds directs this Court to Hartrick v. Great American Lloyds Insurance Co., which
held that a homebuilder's failure to comply with its own implied warranties by not properly
preparing the soil or constructing the foundation was intentional conduct, and therefore was not a
covered "occurrence" under the insured's policy. 62 S.W.3d 270, 276-78 (Tex. App.--Houston [1st
Dist.] 2001, no pet.). Hartrick, however, concerned a duty to indemnify, not a duty to defend. 
There, a jury found in favor of the insured builder on negligence and deceptive-trade-practices-act
claims, while finding for the homeowner on breach-of-warranty claims. Id. at 273. On appeal, the
court held that the insurer had no duty to indemnify, stating that "[b]ecause the judgment in the
underlying case did not . . . award damages 'caused by "an occurrence[,]"' [the insurer] had no duty
to indemnify [the insured] for the judgment in the underlying case." Id. at 278. Here, there is no
trial or verdict in the underlying suits finding for or against the insured. Moreover, only the
underlying pleadings and insurance policy may be examined to determine a duty to defend, and there
is nothing in the underlying petitions to indicate that Main Street intentionally constructed the
foundations to fail.

 Lloyds also relies on this Court's opinion in Devoe. 50 S.W.3d 567. There, however,
we noted that the underlying petition did not "allege any event or series of events that could be
construed as an accident." Id. at 572. Rather, the Devoes alleged "improper and deficient
workmanship and the failure to complete the home in the agreed upon time." Id. at 569. The
Holiday and Armstrong petitions allege that the soil surveys on which the foundation designs were
based were erroneous, resulting in damage to the homes. They allege that the designs proved faulty
or inadequate and that Main Street knew the foundations would fail, but do not allege that Main
Street failed to construct the foundations in accordance with PDG's preconstruction designs. The
allegations in the Holiday and Armstrong petitions differ from those in Devoe in that they do not
assert claims restricted to shoddy workmanship. The petitions sufficiently allege facts that can be
construed as an "occurrence."


B. Business Risk Exclusions

 Insurance policies are contracts, and their construction is governed by the same rules
of construction applicable to all contracts. Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738,
740-41 (Tex. 1998); National Union Fire Ins. Co. v. CBI Indus., 907 S.W.2d 517, 520 (Tex. 1995). 
In construing a written contract, the primary goal of the court "is to give effect to the written
expression of the parties' intent." Balandran, 972 S.W.2d at 741 (citing State Farm Life Ins. Co.
v. Beaston, 907 S.W.2d 430, 433 (Tex. 1995); Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133
(Tex. 1994)). The court should "ascertain the true intent of the parties as expressed in the
instrument." National Union, 907 S.W.2d at 520 (citing Forbau, 876 S.W.2d at 133).

 A written contract that can be given a definite or certain legal meaning is not
ambiguous. National Union, 907 S.W.2d at 520; Coker, 650 S.W.2d 391, 393. If a contract is not
ambiguous, the words used in the contract are to be given their ordinary meaning. See Puckett v.
U.S. Fire Ins. Co., 678 S.W.2d 936, 938 (Tex. 1984); see also Security Mut. Cas. Co. v. Johnson,
584 S.W.2d 703, 704 (Tex. 1979) (terms of insurance contract given "ordinary and generally
accepted meaning"). However, if "the language of a policy or contract is subject to two or more
reasonable interpretations, it is ambiguous," and the construction that would afford coverage to the
insured must be adopted. National Union, 907 S.W.2d at 520; see also Balandran, 972 S.W.2d at
741.

 Without making specific arguments, Lloyds contends that "one or more of the
policies' 'business risk' exclusions are triggered by the allegations in the underlying lawsuit." 
Generally, Lloyds contends that "there is no coverage for faulty workmanship or for a contractor's
failure to perform his contract." Additionally, Lloyds argues that "the business risk exclusions are
designed to protect insurers from a contractor's attempt to recover funds to correct deficiencies
caused by the contractor's questionable performance" and specifically cites exclusions A.2.j.(5), (6),
A.2.k., and A.2.l. as applicable to preclude coverage.


 1. Exclusion A.2.j.(5)

 The policies contain numerous exclusions to property-damage liability, including
section A.2.j.(5), which states:

2. Exclusions. This insurance does not apply to:

 j. Damage to Property


 "Property damage" to:


 (5) That particular part of real property on which you or any contractors
or subcontractors working directly or indirectly on your behalf are
performing operations, if the "property damage" arises out of those
operations . . . .



 Main Street posits that this exclusion should not apply, because Main Street is not
presently "performing operations." The underlying petitions allege that the homebuyers purchased
the homes after Main Street completed construction. Giving the exclusion its plain meaning, the use
of the present tense indicates that the exclusion applies to circumstances where the contractor or
subcontractors are currently working on the project. Words such as "working," "are," "performing,"
and "arising" are not used to extend the policy exclusion to a home purchased after construction is
complete.

 In Houston Building Service, Inc. v. American General Fire & Casualty Co., the
court, interpreting a similarly worded exclusion, addressed the same argument as Lloyds asserts here. 
799 S.W.2d 308, 311 (Tex. App.--Houston [1st Dist.] 1990, writ denied). A janitorial service's
employees negligently applied linseed oil to wooden doors, damaging the property. After the owner
complained, the contractor made a claim under its general liability policy. The insurer denied
coverage, arguing that the policy's business risk exclusions did not cover faulty workmanship. On
appeal, the court agreed and held that the exclusion did not apply because the janitorial service was
operating under an existing contract; therefore, the work had not yet been completed. Although the
facts in Houston Building Service differ, the reasoning is applicable. Since the underlying petitions
indicate that Main Street had completed construction and sold the homes to the homebuyers before
the alleged damage resulted, the exclusion does not preclude Lloyd's duty to defend Main Street.


 2. Exclusion A.2.j.(6)

 Lloyds also contends that business-risk exclusion A.2.j.(6) denies coverage for faulty
workmanship. The exclusion states:


2. Exclusions. This insurance does not apply to:


 j. Damage to Property


 "Property damage" to:


 (6) That particular part of any property that must be restored, repaired or
replaced because "your work" was incorrectly performed on it.


Paragraph (6) of this exclusion does not apply to "property damage" included in the
"products-completed operations hazard."



 Main Street argues that this exclusion "would be applicable but for the fact that the
policy contains an exception to this exclusion," the products-completed operations hazard. The
products-completed operations hazard states the following: 


"Products-completed operations hazard" includes all "bodily injury" and "property
damage" occurring away from premises you own or rent and arising out of "your
product" or "your work" (10) except:



 Products that are still in your physical possession; or
 Work that has not yet been completed or abandoned. (11)




Main Street asserts that the exception to exclusion A.2.j.(6) applies because the claims "involve: (1)
property that was put to its intended use by the homeowners who purchased the homes, (2) property
damage that occurred away from premises owned or rented by Main Street, and (3) [the claims] arise
out of Main Street's work." The underlying petitions support Main Street's contention, because
Main Street and its subcontractors worked on and completed the homes, which Main Street later sold
to the plaintiffs. For these reasons, Lloyds' assertion that Main Street's application of the products-completed operation hazard "fails to negate the application of exclusion A.2.j.(5)" is without merit. 
Main Street completed and sold the homes before the alleged damages; therefore, the products-completed operations hazard exception is not applicable to A.2.j.(5), which contains language that
refers to ongoing operations.


 3. Exclusion A.2.k.

 Lloyds also relies on Exclusion A.2.k. for the denial of a duty to defend. This
provision excludes coverage for "'[p]roperty damage' to 'your product' arising out of it or any part
of it." Lloyds argues that Main Street's homes are its "products," and therefore it should preclude
Lloyds' duty to defend. The term "your product," as stated in the policy includes "goods or products
. . . manufactured, sold, distributed, or disposed of . . . ." The term also includes "[w]arranties or
representations made at any time with respect to the fitness, quality, durability, performance or use
of 'your product,'" as well as "providing or failing to provide warnings or instructions."

 Main Street responds that the definition of "your product" does not apply to a building
and its components. In support of its argument, Main Street relies on Mid-United Contractors, Inc.
v. Providence Lloyds Insurance Co., which interpreted the term as "not apply[ing] to the construction
of [a] building because in ordinary language buildings are constructed or erected, not manufactured,
and because any ambiguity in the policy language must be construed against the insurer and in favor
of the insured." 754 S.W.2d 824, 826 (Tex. App.--Fort Worth 1988, writ denied). We agree with
the Second Court of Appeals' analysis.


 4. Exclusion A.2.l.

 Finally, Lloyds argues that Exclusion A.2.l. applies to preclude its duty to defend
Main Street against the underlying suits:


2. Exclusions. This insurance does not apply to:


 1. Damage to Your Work


 "Property damage" to:


 "Property damage" to "your work" arising out of it or any part of it and
included in the "products-completed operations hazard."



However, the policy provides that the exclusion does not apply "if the damaged work or the work
out of which the damage arises was performed on your behalf by a subcontractor." Both the Holiday
and Armstrong petitions allege that the property damage was caused by the subcontractors who
designed and constructed the foundations. Specifically, the Holiday petition alleges that: "Michael
Alexander and PDG were hired by Main Street, Inc. to design foundations for the homes . . . ." The
Armstrong petition alleges that "Main Street contracted with two foundation engineering firms . . .
to design the foundations in the subdivision." A plain reading of this exclusion in light of the
underlying pleadings demonstrates that the subcontractor exception applies and the exclusion does
not preclude Lloyd's duty to defend.


CONCLUSION


 We hold that the pleadings in each underlying suit allege an "occurrence" that would
trigger Lloyds' duty to defend under the policy, and that no "business risk" exclusions preclude this
duty to defend. Accordingly, we overrule Lloyds' issues and affirm the district court's judgment.



 

 Lee Yeakel, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed: June 13, 2002

Publish

1. Main Street also sought monetary damages, attorney's fees, and court costs.
2. Holiday v. Main St. Homes, Inc., No. GN003243 (98th Dist. Ct., Travis County, Tex. Nov.
6, 2000).
3. For convenience, we will refer to the two foundation engineering firms as PDG.
4. Armstrong v. Main St., Ltd., No. GN003566 (98th Dist. Ct., Travis County, Tex. Dec. 13,
2000).
5. The first policy, issued by Potomac to Main Street, was in effect from September 23, 1998,
to September 23, 1999. CU Lloyd's issued the second policy, which was effective from September
23, 1999, to September 23, 2000.
6. The duty-to-defend language stated that the insurer would "pay those sums that the insured
becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to
which this insurance applies" and that "[w]e will have the right and duty to defend any 'suit' seeking
those damages," and that "[w]e may at our discretion investigate any 'occurrence' and settle any
claim or 'suit' that may result."
7. The policy includes a definitions section, which states in pertinent part:


"Products-completed operations hazard" includes all "bodily injury" and
"property damage" occurring away from premises you own or rent and arising
out of "your product" or "your work" except (1) Products that are still in your
physical possession; or (2) Work that has not yet been completed or abandoned. 


"Your product" means: (a) Any goods or products, other than real property,
manufactured, sold, handled, distributed or disposed of by: (1) You; (2) Others
trading under your name; or (3) A person or organization whose business or
assets you have acquired . . . .


"Your work" means: (a) Work or operations performed by you or on your behalf;
and (b) Materials, parts or equipment furnished in connection with such work or
operations.


The definitions of "your product" and "your work" include: 


(a) Warranties or representations made at any time with respect to the fitness,
quantity, durability, performance or use of ["your product" or "your work"]; and
(b) The providing of or failing to provide warnings or instructions.


As used in the policies, "you" and "your" refers to Main Street.
8. A soil's "plasticity index" describes the range within which the soil, due to water content,
moves or changes its shape, thus behaving "plastically." A higher plasticity index indicates a soil
more prone to shifting and flexing.
9. See National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc., 939 S.W.2d 139,
141 (Tex. 1997). 
10. See footnote 7, supra, for definitions of "your product" and "your work."
11. The policy states that: "'[Main Street's] work' will be deemed completed at the earliest
of the following times: (1) When all of the work called for in your contract has been completed, (2)
When all of the work to be done at the site has been completed if your contract calls for work at
more than one site, (3) When that part of the work done at a job site has been put to its intended use
by any person or organization other than another contractor or subcontractor working on the same
project."