TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-04-00030-CV







Cynthia Sue Vaughn, Appellant


v.


Joseph Patrick Vaughn, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT

NO. FM101530, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



 This is an appeal from an order denying appellant Cynthia Vaughn's petition to
enforce an agreed final divorce decree and her motion to modify the parent-child relationship. The
district court rendered a final decree of divorce on June 22, 2001, and signed a qualified domestic
relations order on September 27, 2002. In a subsequent action, Cynthia Vaughn complained that the
qualified domestic relations order impermissibly altered the division of marital property set out in
the divorce decree and, as a result, diminished her share of her former husband's retirement plans. 
She also alleged material and substantial changes in her financial status and argued for an increase
in her child-support payments. The district court denied her petitions. We will affirm.



BACKGROUND


 Cynthia and Joseph Vaughn were married on February 20, 1988, and had three
children together. Cynthia Vaughn is self-employed as a chiropractor and Joseph Vaughn is
employed by Southwest Airlines. On March 5, 2001, after thirteen years of marriage, Joseph Vaughn
filed for divorce based on standard no-fault grounds. See Tex. Fam. Code Ann. § 6.001 (West 1998). 
Both parties have since re-married to other individuals.

 The district court rendered a final decree ("the Decree") on June 22, 2001, granting
a divorce to the parties on the ground of insupportability, see id., appointing the parties as joint
managing conservators of their three children, see id. § 101.016 (West 2002), and dividing their
marital estate. The Decree designated Cynthia Vaughn as the custodial parent with the exclusive
right to establish the primary residence of the children within Travis and contiguous counties. See
id. § 153.134(b)(1) (West 2002). Joseph Vaughn would pay $450.00 per month in child support, an
amount previously agreed upon by the parties. Since June 22, 2001, the three children have lived
with Cynthia Vaughn.

 The Decree established each parent's rights to possession of the children. 
Memorializing a previous agreement between the parties, the Decree also provided that Joseph
Vaughn, as part of his child-support obligation, would pay off a $17,866.90 marital debt from a loan
taken against his Southwest Airlines 401(k) plan. (1) In exchange, the parties agreed that Joseph
Vaughn's obligation to pay $450.00 per month in child support would not begin until May 1, 2005,
at which point the loan would be paid off.

 The Southwest Airlines 401(k) plan was one of two retirement accounts arising out
of Joseph Vaughn's employment with Southwest Airlines that were part of the marital estate; the
other was a Southwest Airlines Profit Sharing Plan. The Decree awarded Cynthia Vaughn a
percentage of the community property portion of each retirement account, to be more specifically
described in a "qualified domestic relations order" (QDRO): (2)


IT IS ORDERED AND DECREED that the wife, CYNTHIA SUE VAUGHN, is
awarded the following as her sole and separate property, and the husband is divested
of all right, title, interest, and claim in and to that property:


* * *


5. A portion of JOSEPH PATRICK VAUGHN's retirement benefits in the
Southwest Airlines 401(k) plan arising out of JOSEPH PATRICK VAUGHN's
employment with Southwest Airlines, that portion being 40% and more
particularly defined in a Qualified Domestic Relations Order.


6. A portion of JOSEPH PATRICK VAUGHN's retirement benefits in the
Southwest Airlines Profit Sharing Plan arising out of JOSEPH PATRICK
VAUGHN's employment with Southwest Airlines, that portion being 42.5%
of the community portion of the Plan as of May 31, 2001 and more particularly
defined in a Qualified Domestic Relations Order.[ (3) ]


* * *



 The parties were unable to agree on the terms of the QDRO for over a year. On July
10, 2002, the district court held a contested hearing on Cynthia Vaughn's motion to enter a QDRO. 
The hearing primarily involved a determination of the amount of community property in Joseph
Vaughn's Profit Sharing Plan as of May 31, 2001. Deborah Alexander, a certified public accountant,
testified for Joseph Vaughn. Tracing the separate and community interests in the account, she
determined that the total number of units of the Southwest Airlines Stock Fund on May 31, 2001,
was 15,831.866. (4) Joseph Vaughn's separate property portion, after adjustments for splits and other
changes, was 13,113.336 units. Subtracting Joseph Vaughn's separate property from the total
number of units, Alexander determined that 2,718.530 units of the Southwest Airlines Stock Fund
were community property. Applying Cynthia Vaughn's 42.5% interest in the Profit Sharing Plan to
this amount, Alexander concluded that 1,155.375 units of Southwest Airlines Stock Fund were
Cynthia Vaughn's separate property. The Profit Sharing Plan also included two other funds, a MAS
Balanced Portfolio Fund and a Harbor Capital Appreciation Fund, that were entirely community
property. 

 The district court signed a QDRO on September 27, 2002, which, in relevant part,
assigned to Cynthia Vaughn, as Alternate Payee, the following benefits:


a. SOUTHWEST AIRLINES CO. PROFIT SHARING PLAN:


 Alternate Payee is hereby assigned 2.975 units in the MAS Balanced Portfolio
Fund, 0.657 units in the Harbor Capital Appreciation Fund, and 1,155.375 units
in the Southwest Airlines Stock Fund which represents Alternate Payee's 42.5%
percent of "the community property portion" of Participant's Profit Sharing
Plans Account as of May 31, 2001. 


b. SOUTHWEST AIRLINES CO. 401(k) PLAN:


 Alternate Payee is hereby assigned 40% of Participant's 401(K) Plan as of the
date of May 31, 2001 before reduction for any outstanding loan to Participant
from the Plan, such amount to be taken pro rata from each investment fund in
which Participant's 401(K) Plan account balance is invested on May 31, 2001,
other than the Participant's loan fund, if any;


 including earnings thereon and less losses thereon from May 31, 2001, which
are segregated, assigned and transferred to the exclusive beneficial interest of
Alternate Payee.



The QDRO was accepted by the Southwest Airlines plan administrator and became final on October
27, 2002.

 Between May 31, 2001, and November 2002, the stock market had experienced a
devaluation that decreased the value of the plan units that Cynthia Vaughn ultimately received under
the QDRO. When distributions were made in November 2002, she received $88,842.85 from the
plan administrator, $63,643.41 less than the value of her units when the Decree was entered. 
Contending that she was entitled to the dollar value of the units at the time the Decree was entered,
Cynthia Vaughn filed a petition for enforcement on December 16, 2002, seeking to amend the
QDRO to reflect the value of retirement benefits at the time the Decree was entered rather than the
number of shares in each plan. 

 At the same time, Cynthia Vaughn filed a Petition to Modify Parent-Child
Relationship seeking to increase child support payments based on alleged substantial and material
changes in her financial status. See id. § 156.401(a)(1) (West 2002). She asked the district court to
award her, in lieu of the amount of child support in the Decree, the amount of statutorily derived
child support to which she would be presumptively entitled (5)--which, based on Joseph Vaughn's
salary at that time, was determined to be $1,176.56 per month. Of this amount, $450 would continue
to go toward repayment of the marital loan on the 401(k) plan, with $726.56 each month going
directly to Cynthia Vaughn for child support.

 The district court held a hearing on both petitions on October 3, 2003. Cynthia
Vaughn testified that, before the divorce, she had worked as an associate chiropractor in another area
chiropractor's clinic and had received a salary. In 1998, she purchased her own clinic. At the time
of the divorce, she was averaging about $113,000 in salary per year from her practice. In October
2001, several months after the divorce, she relocated her clinic. She admitted that she failed to do
any marketing for this new location. She subsequently experienced a slow but steady decline in the
number of patients she saw but continued to work the same number of hours.

 At first, Cynthia Vaughn continued to pay herself the salary she had been accustomed
to receiving as a salaried employee, drawing on a line of credit extended to her clinic. At the time
of her testimony, she had reached the limit of this line of credit, as well as the credit limits of her
personal credit cards; she owed $42,000 on the line of credit and $40,000 on her credit cards. By
the time of the hearing, she was paying herself a salary of about $2,462 per month. Her new
husband, who was also a chiropractor and to whom she had sold a half-interest in the clinic, was
receiving half of the net income generated by the practice. Through September 2003, he had earned
$12,750, and she had earned $19,700 from the clinic's profits for the calendar year. During the
previous year, her husband had received only $100 from the clinic.

 Cynthia Vaughn had taken several measures to improve marketing and increase her
patient base. She had taken out a larger advertisement in the phone book, and she and her staff had
received telephone coaching and have begun sending advertisements to new residents of Austin. She
joined a management practice company, which she and her staff attended several times a year for
extensive training. At the time of the hearing, these changes had yielded a modest impact on her
practice, but she had a positive outlook for her clinic for the future. Furthermore, her average
monthly expenses had declined from $7,868.78 per month in 2001 to $6,466.77 per month in 2003. 

 Cynthia Vaughn traveled out of town on several occasions between July 26, 2001,
and December 5, 2002. Much of the travel was work-related and within Texas. She and her staff
attended a weekend training session held by the management practice company she had joined. She
also attended continuing education classes and took several trips in connection with her membership
on the National Board of Chiropractic Examiners. Her chiropractic clinic covered the expenses of
any travel that was work-related or for continuing education. The U.S. Department of Veterans
Affairs reimbursed her for two trips she made to Washington, D.C.

 She continued to travel in 2003. In January, she and her husband took her children
on a cruise to the Western Carribean. In February, they went skiing, using Southwest Airlines Rapid
Rewards points to purchase the plane tickets. Her new husband paid most of the expenses of these
trips. At the time, her husband received a salary of $2,500 per month from his position with the
American Chiropractic Association. He no longer holds this position, and his only current source
of income is his work at the chiropractic clinic. When Cynthia Vaughn and her husband are away
from the clinic, they hire someone to cover the practice, whom they pay $200 per day.

 Joseph Vaughn also testified at the hearing. At the time of the divorce, he received
a monthly salary of approximately $5,025 from his employment with Southwest Airlines. Joseph
Vaughn contributed $469.52 per month to his 401(k) plan and paid $700 per month on his vehicle
note. (6) His monthly expenses exceeded his monthly income by about $2,500.

 Southwest Airlines had recently offered him a position that would have required him
to relocate. Joseph Vaughn turned down the position because he wanted to stay in Austin to be near
his children. As a result, Southwest Airlines placed him in an hourly position that paid significantly
less than what he could have been making. In his new position, he has few opportunities to work
overtime.

 At the time of the hearing, Joseph Vaughn was paying temporary child support
pursuant to a court order. Before the temporary support payments, he had provided several hundred
dollars for his children each month in addition to the $450.00 he paid on the loan on his 401(k) plan. 
Joseph Vaughn visited with his children regularly. 

 The district court denied Cynthia Vaughn's petitions. This appeal followed.


DISCUSSION


 On appeal, Cynthia Vaughn raises two issues, challenging the district court's refusal
to grant her petition for enforcement seeking to amend the QDRO and its denial of her petition to
modify the parent-child relationship seeking increased child support payments. We will address each
in turn.


Petition for enforcement of final divorce decree

 In her first issue, Cynthia Vaughn argues that the district court erred in refusing to
grant her petition for enforcement, in which she had asked the court to amend the language of the
QDRO to reflect the value of retirement benefits at the time of the Decree's entry. In particular, she
asserts that the QDRO improperly changed the parties' agreed division of their marital estate
memorialized in the Decree. See Tex. Fam. Code Ann. § 9.007(a). She claims that the Decree
unambiguously provided that her share in the Southwest Airlines retirement plans would be
determined as of May 31, 2001. She argues that the decree effectively established May 31, 2001,
as a "valuation cut-off date," on which date the plan administrator would calculate the amounts due
to her under the plans by applying her percentage interest in each account to the total value of each
plan on that date. She believed that any fluctuations in the equity value of these accounts occurring
after May 31, 2001, would not affect the dollar amount distributed to her from the accounts. She
further contends that the QDRO, which was accepted by the plan administrator on October 27, 2002,
improperly included the language, "including earnings thereon and less losses theron from May 31,
2001, which are segregated, assigned, and transferred to the exclusive beneficial use of" Cynthia
Vaughn. She asserts that this language conflicts with the clear and unambiguous terms of the Decree
and improperly alters the substantive division of property made in the Decree.

 An agreed divorce decree implementing an agreed property division is controlled by
the rules of construction applicable to ordinary contracts. Allen v. Allen, 717 S.W.2d 311, 312 (Tex.
1986); Harvey v. Harvey, 905 S.W.2d 760, 764 (Tex. App.--Austin 1995, no writ). If a divorce
decree is unambiguous, the court has no authority to alter or modify the original disposition of
property. Haworth v. Haworth, 795 S.W.2d 296, 300 (Tex. App.--Houston [14th Dist.] 1990, no
writ). Whether an ambiguity exists in an agreement is a question of law, which we review de novo. 
National Union Fire Ins. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995); Bishop v. Bishop,
74 S.W.3d 877, 880 (Tex. App.--San Antonio 2002, no pet.). Conflicting interpretations or
expectations of the parties regarding the contract do not create an ambiguity. Forbau v. Aetna Life
Ins. Co., 876 S.W.2d 132, 134 (Tex. 1994). Rather, a contract is ambiguous if its meaning is
uncertain or it is reasonably susceptible to more than one meaning. Coker v. Coker, 650 S.W.2d 391,
393 (Tex. 1983).

 The family code authorizes actions to either enforce a prior divorce decree or to
clarify an ambiguous decree. See Tex. Fam. Code Ann. §§ 9.006-.008 (West 1998). A court may
render orders to enforce the division of property made in the decree "to assist in the implementation
of or to clarify the prior order." Id. § 9.006(a). If the district court finds the original division of
property ambiguous or not specific enough to be enforceable by contempt, it may enter a clarifying
order to enforce compliance with original division of the property. Id. § 9.008(b).

 Furthermore, a party may petition a court to render a QDRO if the court that rendered
a final decree of divorce dividing the marital property did not provide a QDRO. Id. § 9.103 (West
1998). However, a court may not amend, modify, alter, or change "the division of property made
or approved in the decree," and an "order to enforce the division is limited to an order to assist in
the implementation of or to clarify the prior order." Id. § 9.007(a); see also Marshall v. Priess, 99
S.W.3d 150, 157 (Tex. App.--Houston [14th Dist.] 2002, no pet.). Such orders may more precisely
specify the manner of carrying out the property division previously ordered so long as the substantive
division of the property is not altered. Dechon v. Dechon, 909 S.W.2d 950, 956 (Tex. App.--El
Paso 1995, no writ). Altering the substantive division of property made in a final divorce decree is
beyond the power of the district court, and such a change is unenforceable. Tex. Fam. Code Ann.
§ 9.007(b); see also Haworth, 795 S.W.2d at 300 ("Because we have found the original decree
unambiguous, the trial court had no authority to enter an order modifying the original disposition of
property.").

 The Decree itself did not indicate whether Cynthia Vaughn would be awarded a
percentage of the units or a percentage of the market value of each plan as of May 31, 2001. (7) 
Moreover, it expressly contemplated that a QDRO would be entered to effectuate the division of
property specified in the decree. Specifically, it stated that distributions made to Cynthia Vaughn
from the retirement plans would be "more particularly defined in a Qualified Domestic Relations
Order."

 The QDRO entered by the court can properly be viewed as a clarifying order. See
Tex. Fam. Code Ann. § 9.008(b); Alford v. Alford, 40 S.W.3d 187, 189 (Tex. App.--Texarkana
2001, no pet.). The QDRO did not alter the substantive division of property made in the divorce
decree--it did not change the date on which Cynthia Vaughn's interests in the plans would be
calculated, nor did it change the percentage share that she would received from the plans. The
QDRO merely clarified that Cynthia Vaughn was to receive units from the Profit Sharing Plan
representing 42.5% of the community portion of that plan as of May 31, 2001. The QDRO clarified
that the value of Cynthia Vaughn's awarded units would fluctuate with the market after May 31,
2001.

 The QDRO incorporated the parties' agreement by providing that Cynthia Vaughn's
share of the retirement plans would be calculated by applying a certain percentage to each account. 
Moreover, the Decree itself had stipulated that a QDRO be entered to effectuate and "more
particularly define" this division. The QDRO therefore served its intended purpose of implementing
and clarifying the division of benefits set out in the original decree and did not impermissibly
"amend, alter, modify, or change the division of property made or approved in the decree of
divorce." See Tex. Fam. Code Ann. § 9.007(a). We overrule Cynthia Vaughn's first issue.


Petition to modify parent-child relationship

 In her second issue, Cynthia Vaughn argues that the district court erred in denying
her petition to modify parent-child relationship because the evidence adduced at trial
overwhelmingly proved a material and substantial change in her economic circumstances since the
entry of the last order governing her child support. In particular, she argues that the district court
abused its discretion by failing to make findings under the three-step statutory procedure for setting
child support. See id. § 154.125(b) (West 2002); Sanchez v. Sanchez, 915 S.W.2d 99, 102 (Tex.
App.--San Antonio 1996, no writ). She also argues that a modification is in the best interest of her
children.


 Section 154.125(b) findings

 First, Cynthia Vaughn argues that the district court erred by failing to make statutory
findings when denying her petition to modify. By implication, she also argues that the district court
abused its discretion in failing to analyze the statutory guidelines for setting child-support payments. 
See Tex. Fam. Code Ann. § 154.125(b); Sanchez, 915 S.W.2d at 102. 

 When initially setting child support payments, a court must consider and make
findings under the statutory guidelines. Tex. Fam. Code Ann. § 154.125(b); Sanchez, 915 S.W.2d
at 102. However, parties may make an agreement as to child-support amounts outside the guidelines. 
Tex. Fam. Code Ann. § 154.124(a) (West 2002). If a court finds the agreement to be in the child's
best interest, it shall enter an order in accordance with the agreement. Id. § 154.124(b).

 It is within the district court's discretion whether to file findings when ordering or
rendering child support. In re D.S., 76 S.W.3d 512, 522 (Tex. App.--Houston [14th Dist.] 2002,
no pet.) (trial court's findings only required when amount of child support ordered or rendered varies
from guidelines); see also Tex. Fam. Code Ann. § 154.130 (West 2002). No findings of fact are
required in a modification hearing unless there are disputed fact questions over ultimate controlling
issues. In re Striegler, 915 S.W.2d 629, 635 (Tex. App.--Amarillo 1996, writ denied). A denial
of a motion to modify child support is not an order. In re D.S., 76 S.W.3d at 522 (court merely
denied motion to modify agreed order; it did not issue or render new child support order). There are
no disputed fact questions regarding ultimate controlling issues in this case. Because this appeal
arises from a denial of a petition to modify rather than from an order setting child support, the district
court did not abuse its discretion in refusing to make child-support findings when denying a request
to modify. See id.

 A district court may consider the child support guidelines to determine whether there
has been a material or substantial change of circumstances "that warrants a modification of an
existing child support order if the modification is in the best interest of the child." Tex. Fam. Code
Ann. § 156.402(a) (West 2002). If the amount of support contained in the order does not
substantially conform with the guidelines for single and multiple families under chapter 154 of the
family code, the court "may modify the order to substantially conform with the guidelines if the
modification is in the best interest of the child." Id. § 156.402(b) (Emphasis added.). A court may
also consider other relevant evidence in addition to the factors listed in the guidelines. Id. 

 Given the evidence in this case, it was within the district court's discretion to
determine that there was not a material and substantial change. Therefore, it was within its
discretion to deny the petition to modify.


 Denial of modification petition

 Finally, Cynthia Vaughn argues that the district court erred because modification
would be in the best interest of the children. A district court may modify a child support order upon
a showing that the circumstances of the children affected by the order have materially and
substantially changed since the order was signed. Tex. Fam. Code Ann. § 156.401(a)(1). The
district court is accorded broad discretion in setting and modifying child support payments and,
absent a clear abuse of discretion, the court's order will not be disturbed on appeal. In re P.J.H., 25
S.W.3d 402, 405 (Tex. App.--Forth Worth 2000, no pet.); Hoffman v. Hoffman, 805 S.W.2d 848,
851 (Tex. App.--Corpus Christi 1991, writ denied); see also DuBois v. DuBois, 956 S.W.2d 607,
610 (Tex. App.--Tyler 1997, no pet.). The test for an abuse of discretion is whether the district
court acted without reference to any guiding legal principles, in other words, whether it acted
arbitrarily or unreasonably. Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990); Pecht v. Pecht,
874 S.W.2d 797, 800 (Tex. App.--Texarkana 1994, no writ).

 Under an abuse of discretion standard, legal and factual sufficiency of the evidence
are not independent grounds for error but are relevant considerations in evaluating whether there was
an abuse of discretion. Pecht, 874 S.W.2d at 800. In making that determination, we view the
evidence in the light most favorable to the district court's decision and indulge every legal
presumption in favor of the decision. Tucker v. Tucker, 908 S.W.2d 530, 532 (Tex. App.--San
Antonio 1995, writ denied). If there is some probative, substantive evidence to support the district
court's decision, there was no abuse of discretion. Id.

 In a modification proceeding, the court compares the financial circumstances of the
child and the affected parties at the time the support order was entered with their circumstances at
the time the modification is sought. Holley v. Holley, 864 S.W.2d 703, 706 (Tex. App.--Houston
[1st Dist.] 1993, writ denied). The movant has the burden to show a material and substantial change
by a preponderance of the evidence. Id. The best interest of the child should always be the district
court's primary consideration. See Tex. Fam. Code Ann. § 156.402(b). The obligor's ability to pay
is also a factor for the court to consider. See, e.g., Smith v. Smith, 143 S.W.3d 206, 217 (Tex.
App.--Waco 2004, no pet.) (each parent should support child commensurate with his or her ability
to pay, but obligation should not be so great as to deny that party necessary expenses of living). A
parent's reduction in income may give a court a reason to modify child support. See In re D.S., 76
S.W.3d at 520 (voluntary underemployment is factor court may consider in modification); In re 
Davis, 30 S.W.3d 609, 616-17 (Tex. App.--Texarkana 2000, no pet.); Woodall v. Woodall, 837
S.W.2d 856, 858 (Tex. App.--Houston [14th Dist.] 1992, no writ); Casterline v. Burden, 560
S.W.2d 499, 501 (Tex. Civ. App.--Dallas 1977, no writ).

 Joseph Vaughn's income has remained relatively the same since the time of the
decree. His monthly expenses exceed his income by more than two thousand dollars. His new wife
helps him with these expenses. Cynthia Vaughn's income has decreased in large part because she
sold half her interest in the chiropractic clinic to her new husband. She also sees fewer patients. 
Still, her earnings potential from her clinic, in light of both her previous salary and her increased
marketing efforts, is positive, and she expects, by her own admission, "an upward trend" in her
business. The district court was able to consider all the evidence and was in the position to observe
the demeanor of the parties in light of the best interests of the children. Given the complex nature
of the ongoing relationships in this case and the changing financial situations of all the parties, we
are unable to conclude that the district court abused its discretion in denying Cynthia Vaughn's
request for modification. We overrule Cynthia Vaughn's second issue. 

CONCLUSION


 We have overruled Cynthia Vaughn's issues on appeal. We affirm the district court's
order denying the petition to enforce and the petition to modify.


 

 Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed: May 12, 2005

1. The circumstances concerning this loan are not a part of this record and are not at issue on
appeal.
2. A QDRO permits a non-employee former spouse to receive directly his or her share of
retirement benefits from a retirement plan that is part of the marital estate. See Tex. Gov't Code
Ann. § 804.001(4) (West 2004). These benefits would otherwise be paid to the plan participant (the
employee former spouse). Id. A QDRO is a signed court order, directed to a retirement plan
administrator, setting out in detail the information the administrator would need in order to calculate
and send to each former spouse the correct amount of payment. See id. § 804.003(f). An order
becomes "qualified" by containing statutorily required information, such as the name and address
of the plan participant and the alternate payee (non-employee former spouse), the amount or
percentage to be paid to each, or the method for calculating the amount to be paid, and the number
of payments or period of time to which the order applies. Id. A party may petition a court to render
a QDRO if the court that rendered a final decree of divorce did not provide a QDRO permitting
payment of benefits to an alternate payee. Tex. Fam. Code Ann. § 9.103 (West 1998).
3. The Decree confirmed that 1,625.255435 shares of common stock in Southwest Airlines
Profit Sharing Plan were Joseph Vaughn's separate property.
4. Alexander testified that Southwest Airlines converted from shares to units in the quarter
ended September 30, 1995, to facilitate investment within the fund, creating the equivalent of a
mutual fund that held all the plan's investments as of the date of the conversion. She further testified
that the conversion rate between shares and units was not one to one.
5. See Tex. Fam. Code Ann. § 154.125(b) (West 2002).
6. At the hearing, Cynthia Vaughn testified that Joseph Vaughn had repaid the loan they had
taken on his 401(k) plan.
7. Only paragraph 6 of the Decree, relating solely to the Profit Sharing Plan, referenced the
May 31, 2001, date. Cynthia Vaughn argues that the Decree established May 31, 2001, as the
"valuation cut-off date" for both plans.